**NOTICE: SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion. Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision. Slip opinions can be changed by subsequent court orders. For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion. Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports. An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.** The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports. Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

FILE
IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON
DATE FEB 12 2015
CHIEF JUSTICE

This opinion was filed for record
at 8:00 a.m. on 2-12-15

Ronald R. Carpenter
Supreme Court Clerk

IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| SCOTT CORNELIUS, an individual, PALOUSE WATER CONSERVATION NETWORK, and SIERRA CLUB PALOUSE GROUP, | ) ) ) ) ) | No. 88317-3 En Banc |
| Appellants, | ) ) ) | |
| v. | ) ) | |
| WASHINGTON DEPARTMENT OF ECOLOGY, WASHINGTON STATE UNIVERSITY, and WASHINGTON POLLUTION CONTROL HEARINGS BOARD, | ) ) ) ) ) ) ) | |
| Respondents. | ) ) | Filed FEB 1 2 2015 |

OWENS, J. — In 2003, our legislature made substantial amendments to this state's water law. In 2010, we found those amendments facially constitutional. Today, Scott Cornelius, Palouse Water Conservation Network, and Sierra Club Palouse Group (collectively Cornelius) bring an as-applied constitutional claim (among other claims) against Washington State University (WSU), the Department of Ecology, and the Pollution Control Hearings Board (PCHB). We find the

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

amendments were applied constitutionally and find the other claims unavailing. We affirm.

## FACTS

Cornelius and WSU both draw water from the Grande Ronde Aquifer underlying the Palouse Basin. The aquifer is declining from overpumping. WSU has seven groundwater rights that serve its Pullman campus with priority dates ranging from 1934 to 1987. These rights are documented by claims, permits, or certificates depending on when the rights were perfected. Two certificates are primarily at issue in this case: 5070-A and 5072-A. Although the documents for some of WSU's rights state that their purpose was "municipal," the documents for Certificate Nos. 5070-A and 5072-A state their purpose as "domestic." 4 Admin. Record (AR) Doc. 85, at 5 (Order on Summ. J.). The holders of "municipal" water rights are now entitled to added protections under the law. *See* RCW 90.14.140(2)(d). There was no added protection for "municipal" water rights when Ecology issued Certificate Nos. 5070-A and 5072-A.

Ecology issued Certificate No. 5070-A in 1962 and Certificate No. 5072-A in 1963. When Ecology granted those certificates, it did so on the basis of system capacity rather than beneficial use. Those two certificates, as well as the document representing WSU's other water rights, assigned the water rights to particular wells. However, over the years, WSU has integrated and consolidated its water system,

2

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

shifting almost all of its groundwater pumping from older wells to two newer wells drawing from the same aquifer. WSU admits Ecology did not previously authorize that integration, and no court has previously adjudicated WSU's water rights. However, after the legislature enacted the municipal water law (MWL) in 2003, LAWS OF 2003, 1st Spec. Sess., ch. 5, WSU applied to Ecology to amend its water right permits and certificates to conform to its actual usage. WSU wanted to legitimize its integrated system, and it sought to amend its certificates to explicitly authorize it to withdraw the aggregate quantity of water represented by all its relevant water rights from the two wells it uses today. Notice of WSU's application appeared in the *Moscow-Pullman Daily News* as required by statute, and Cornelius timely protested. RCW 90.03.280.

Processing WSU's applications required Ecology to apply a number of common law principles and statutes such as the common law of abandonment, the water code, and the State Environmental Policy Act (SEPA), chapter 43.21C RCW. Ecology also applied the MWL. Ultimately, Ecology approved all but one of WSU's applications.[1] Cornelius appealed Ecology's decision approving the other applications to the PCHB, an independent agency authorized to hear certain environmental appeals under RCW 43.21B.110, on various grounds. The PCHB ruled in favor of WSU and Ecology on all issues, some on summary judgment and some after a hearing.

---

[1] WSU has not challenged Ecology's denial, and thus it is not before us.

Cornelius appealed to the Whitman County Superior Court, which affirmed the PCHB, and to the Court of Appeals, which certified the case to us. We accepted certification.

## ISSUES

1. Is the MWL unconstitutional as applied to Cornelius?

2. Did the PCHB err by allowing Ecology to use a streamlined process for evaluating WSU's application?

3. Does RCW 90.44.100 authorize WSU to amend its certificates and add well locations?

4. Did the PCHB correctly apply SEPA?

5. Did the PCHB's summary judgment order improperly preclude Cornelius from presenting evidence about impairment and the public welfare?

6. Did RCW 90.44.130 require Ecology to determine if WSU's proposal would maintain a "safe sustaining yield" of groundwater?

7. Did WSU exercise reasonable diligence in putting its water rights to beneficial use?

8. Did WSU abandon Claim No. 98523?

9. Did the PCHB err in granting WSU's summary judgment motion regarding beneficial use and reasonable efficiency?

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

10.  Did the water quantities authorized under Permit No. G3-28278P need to be reduced?

11.  Is Cornelius entitled to attorney fees?

STANDARD OF REVIEW

The Washington Administrative Procedure Act (APA), chapter 34.05 RCW, governs our review of PCHB orders.  *See* RCW 34.05.570(1).  We sit in the same position as the superior court and apply the APA to the administrative record.  *Postema v. Pollution Control Hr'gs Bd.*, 142 Wn.2d 68, 77, 11 P.3d 726 (2000).  We will grant relief from an order if we determine that it is based on an unconstitutional statute, an erroneous interpretation or application of the law, or insufficient evidence, among other things.  RCW 34.05.570(3)(a), (d), (e).  "The burden of demonstrating the invalidity of agency action is on the party asserting invalidity"—Cornelius in this case.  RCW 34.05.570(1)(a).  We review questions of law and an agency's application of the law to the facts de novo, but we give the agency's interpretation of the law great weight where the statute is within the agency's special expertise.  *Port of Seattle v. Pollution Control Hr'gs Bd.*, 151 Wn.2d 568, 593, 90 P.3d 659 (2004).  We will overturn an agency's factual findings only if they are clearly erroneous.  *Id.* at 594.  Finally, many of the PCHB's rulings were made on summary judgment, which we review de novo, making the same inquiry as the PCHB.  *See Owen v. Burlington N. Santa Fe R.R.*, 153 Wn.2d 780, 787, 108 P.3d 1220 (2005).

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

ANALYSIS

1. *Constitutional Claims*

Cornelius argues that the MWL cannot be applied in this case without violating his due process rights and the separation of powers doctrine. He argues both of these doctrines were violated when Ecology applied the MWL to WSU and approved WSU's groundwater amendment application. Cornelius claims those constitutional doctrines were violated when Ecology and the PCHB "reviv[ed]" WSU's allegedly relinquished groundwater rights. Appellants' Opening Br. at 20.

Before we address Cornelius's as-applied constitutional claims, it is helpful to review Washington's water laws and our recent decision in *Lummi Indian Nation v. State*, 170 Wn.2d 247, 241 P.3d 1220 (2010), which dealt with the facial constitutional challenge to the MWL underlying the conflict here.

A. *Washington Water Law and* Lummi Indian Nation

Washington, like other western territories in the late 1800s, followed a water law system called "prior appropriation." *Ellis v. Pomeroy Improvement Co.*, 1 Wash. 572, 578, 21 P. 27 (1889). Prior appropriation is a system of "first in time . . . first in right," and our legislature formally recognized that system in 1917. LAWS OF 1917, ch. 117, § 1 (currently codified as RCW 90.03.010). Prior appropriation focuses on the beneficial use of water and generally provides that a person's right to the

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

beneficial use of water is superior to others if he or she first appropriated the water for beneficial use. *Id.*

Washington still follows the general prior appropriation system but has a regulatory permit scheme to balance and prioritize competing beneficial uses of the state's waters. Put simply and very generally, would-be users submit applications to Ecology and Ecology determines what water is available and to what beneficial use it can be applied before issuing permits. *Lummi Indian Nation*, 170 Wn.2d at 252-53; RCW 90.03.290(1). Permits represent inchoate water rights, which are not choate (i.e., vested) until perfected. *Lummi Indian Nation*, 170 Wn.2d at 253; RCW 90.03.330. Before the right is perfected, the applicant still has an incomplete appropriative right in good standing, but he or she must act with reasonable diligence to perfect the right by developing the water system. RCW 90.03.320; *Lummi Indian Nation*, 170 Wn.2d at 253. Ecology can cancel the permit if the permit's terms are violated. RCW 90.03.320. Once the water right is perfected, Ecology issues a certificate. RCW 90.03.330. Importantly, the perfected right evidenced by the certificate relates back to the date the applicant filed the original application with Ecology. RCW 90.03.340. Thus, the date a water right vests is often determined by the date the application was filed.

Ecology and its predecessor have applied the perfection doctrine inconsistently over the years. *Lummi Indian Nation*, 170 Wn.2d at 254-55. Initially, water users

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

needed to both appropriate water and put it to beneficial use before they could perfect their right. *See, e.g., Ortel v. Stone*, 119 Wash. 500, 503, 205 P. 1055 (1922). However, in the 1950s, Ecology and its predecessor issued both permits and certificates based on a user's need and capacity rather than on its actual beneficial use; this different approach was aptly named "'pumps and pipes.'" *Dep't of Ecology v. Theodoratus*, 135 Wn.2d 582, 587, 957 P.2d 1241 (1998). Tension arose because of this inconsistency, and it led to our decision in *Theodoratus*.

George Theodoratus had a water right application approved by Ecology for a development he planned to build. *Id.* Ecology's "Report of Examination" approving his application had language purporting to create a vested water right based on his development's capacity for water so long as it was built by a particular date. *Id.* Under the original report, Theodoratus would have been entitled to a certificate and his rights would have thus vested once he completed his water supply system and it was capable of delivering water—regardless of actual beneficial use. *Id.* Theodoratus was delayed in completing the development, and Ecology granted him several permit extensions, the last of which placed conditions on his water rights vesting. *Id.* at 587-88. The conditions provided, among other things, that his vested water right would be determined based on actual application of water to beneficial use, not on system capacity. *Id.* at 588. Theodoratus appealed Ecology's condition, and we eventually held that the relevant statutes and our common law left no doubt that Theodoratus's

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

vested water rights must be based on beneficial use—not system capacity. *Id.* at 590. We noted, however, that our decision did not involve "municipal water suppliers," which are treated differently under our "statutory scheme." *Id.* at 594.

Specifically, since 1967, our statutory scheme has treated water rights claimed for municipal water supply purposes as immune from statutory relinquishment, while nonmunicipal water rights may be relinquished through nonuse. LAWS OF 1967, ch. 233, § 18 (codified as RCW 90.14.180); *cf.* LAWS OF 1967, ch. 233, § 14 (codified as RCW 90.14.140(2)(d)). Generally, a nonmunicipal water right holder relinquishes all or part of its right if it fails to beneficially use the water right for five successive years without sufficient cause. RCW 90.14.180; *see* RCW 90.14.140(2)(d). However, despite this favorable treatment, until recently, our laws did not define "municipal water supplier" or "municipal water supply purposes."

This ambiguity in the water code, combined with our *Theodoratus* decision, caused water users concern about the validity of their water rights based on system capacity and whether their water rights were subject to relinquishment. In response, our legislature amended the water law act. *Lummi Indian Nation*, 170 Wn.2d at 256; LAWS OF 2003, 1st Spec. Sess., ch. 5; SECOND ENGROSSED SECOND SUBSTITUTE H.B. 1338, 58th Leg., 1st Spec. Sess. (Wash. 2003) (2E2SHB 1338). In addition to defining "municipal water supplier" and "municipal water supply purposes" for the first time, the law declared that water right certificates issued prior to September 9,

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

2003, for municipal water supply purposes based on system capacity were in good standing. *Lummi Indian Nation*, 170 Wn.2d at 256-57 (citing LAWS OF 2003, 1st Spec. Sess., ch. 5; 2E2SHB 1338; H.B. REP. ON 2E2SHB 1338, at 1-2). It further provided that after September 9, 2003, Ecology must issue certificates based on the actual beneficial use of water. *Id.* at 257 (quoting RCW 90.03.330(4)). As we stated in *Lummi Indian Nation*, "The legislation essentially put the legislature's imprimatur on our holding in *Theodoratus* prospectively while confirming the good standing of water certificates issued under the former system." *Id.*

The amendments garnered opposition from various groups and ultimately led to our *Lummi Indian Nation* decision. In that case, two groups of challengers (including Cornelius) brought facial constitutional challenges, arguing that the amendments, specifically RCW 90.03.015(3) and (4) and RCW 90.03.330(3), violated separation of powers and due process. *Id.* at 259, 265. The challengers argued the amendments violated separation of powers by changing the requirements we noted in *Theodoratus* for private water rights to vest and thereby unsettling our decision. *Id.* at 259-60. As discussed further below, we found no separation of powers violation because the legislature did not "apply the law to an existing set of facts, affect the rights of parties to the court's judgment, . . . interfere with any judicial function," or adjudicate facts. *Id.* at 263. The challengers argued that the amendments violated due process by potentially depriving junior water users of vested rights by "'resurrecting'" the

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

relinquished water rights of potentially senior rights holders. *Id.* at 268-69. Again, as discussed further below, we found that the amendments by themselves did not resurrect any relinquished rights and did not deprive junior water rights holders of vested property rights. *Id.* We left "for another day consideration of any as-applied challenges." *Id.* at 263. Today is that day.

    B. *Separation of Powers*

    The doctrine of separation of powers "'preserves the constitutional division between the three branches of government'" and ensures that the activities of one branch do not "'threaten or invade the prerogatives of another.'" *In re Estate of Hambleton*, 181 Wn.2d 802, 817, 335 P.3d 398 (2014) (quoting *State v. Elmore*, 154 Wn. App. 885, 905, 228 P.3d 760 (2010)); *Zylstra v. Piva*, 85 Wn.2d 743, 750, 539 P.2d 823 (1975). The legislature violates separation of powers when it applies "the law to an existing set of facts, affect[s] the rights of parties to the court's judgment, . . . interfere[s] with any judicial function," or adjudicates facts. *Lummi Indian Nation*, 170 Wn.2d at 263. The legislature is occasionally disappointed with our interpretation of a statute, and it may amend statutes within its sphere of authority and may sometimes apply the amended statute retroactively; however, the legislature may not retroactively reverse decisions of this court or interfere with any judicial functions. *Hale v. Wellpinit Sch. Dist. No. 49*, 165 Wn.2d 494, 509-10, 198 P.3d 1021 (2009). "[W]hen the legislature passes a statute premised on finding an adjudicative fact" or if

11

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

it interferes with someone's previously litigated vested rights, "it may violate separation of powers." *Lummi Indian Nation*, 170 Wn.2d at 264-65.

Cornelius first claims that by adjudicating facts, the PCHB interpreted the MWL in the manner we stated in *Lummi Indian Nation* would violate the separation of powers doctrine. In that case, we were careful not to prejudge whether water rights holders could bring a successful as-applied challenge if their previously adjudicated water rights were sufficiently affected by the MWL. *See id.* at 265. But Cornelius's as-applied challenge is a thinly veiled facial challenge, and it fails.

Cornelius argues that when the PCHB applied the MWL in this case, it changed the past status of WSU's water rights—rights that had already been relinquished by operation of law though not yet memorialized by Ecology or in a court opinion. He claims that because WSU's two certificates were not issued specifically for "municipal water supply purposes," WSU's failure to use the water for more than five years prior to 2003 relinquished WSU's water rights. Appellants' Opening Br. at 22-24. And because, he contends, WSU's rights were relinquished through nonuse, the PCHB ran afoul of the separation of powers doctrine by applying the MWL and "chang[ing] that legal conclusion." *Id.* at 19-20.

We disagree. Retroactive application of a statute does not necessarily violate separation of powers—there must be some interference either with vested rights or with the prerogatives of another branch of government. *Hale*, 165 Wn.2d at 507-10;

12

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Lummi Indian Nation*, 170 Wn.2d 262. In *Lummi Indian Nation*, we already held that retroactively applying the MWL does not violate the constitution—including RCW 90.03.560, the amendment that allows for water rights to be relabeled using the new definition of "municipal water supply purposes." 170 Wn.2d at 260-63, 272. We found that allowing this statute to apply retroactively is a legislative policy decision—confirming existing rights—not a factual adjudication. *Id.* at 264-65. Although we stated that retroactive application of this statute could unconstitutionally disturb previously litigated adjudicative facts, we must be faced with previously litigated adjudicative facts in order to find an as-applied constitutional violation.

Here, there are no previously litigated adjudicative facts regarding WSU's past water rights. Accordingly, there is no way that the PCHB violated the separation of powers doctrine by applying the MWL to WSU's certificates—there were no "adjudicative facts" the PCHB could have upset. *Id.* at 265. The PCHB merely applied the MWL definition to WSU in the current adjudication. That is the precise general application of the MWL we found constitutional in *Lummi Indian Nation*. *Id.* at 260-63, 272.

Cornelius would have us overrule *Lummi Indian Nation* in all but name. Cornelius would have us rule that the purpose of use stated on water right certificates must control—that only certificates stating a "municipal" purpose can be treated as municipal. That holding would invalidate RCW 90.03.560 on its face and overrule

13

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Lummi Indian Nation*, where we held that the new definition of "municipal water supply purposes" applies retroactively, even to rights that were not originally labeled "municipal." *Id*. at 268-69.

RCW 90.03.560 demonstrates that the legislature foresaw that too much weight might be placed on the characterizations of water rights holders and water rights use on certificates issued before "municipal" was defined. The legislature created a mechanism to fix this problem. The statute states in relevant part:

> When requested by a municipal water supplier or when processing a change or amendment to the right, the department *shall amend* the water right documents and related records to ensure that water rights that are for municipal water supply purposes, as defined in RCW 90.03.015, are correctly identified as being for municipal water supply purposes. This section authorizes a water right or portion of a water right held or acquired by a municipal water supplier that is for municipal water supply purposes *as defined in RCW 90.03.015* to be identified as being a water right for municipal water supply purposes.

RCW 90.03.560 (emphasis added). Thus, the legislature recognized that some water rights had been issued for municipal purposes under nonmunicipal labels and provided a simple mechanism to fix that problem. And as we held in *Lummi Indian Nation*, allowing this statute to apply retroactively is a legislative policy decision—confirming existing rights—not a factual adjudication. 170 Wn.2d at 264-65.

This case exemplifies the labeling problem the legislature sought to resolve in passing RCW 90.03.560. When the relevant certificates were issued in 1962 and 1963, Ecology did not have a reason to be precise about distinguishing "municipal"

14

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

and domestic uses because "municipal water supply purposes" was undefined and the legislature did not give municipal suppliers an exemption from relinquishment until 1967. *See id.* at 255-56; LAWS OF 1967, ch. 233, § 14 (currently codified as RCW 90.14.140). Thus, Ecology could have issued domestic supply certificates to entities that were functionally municipal and vice versa.

That is clearly the case here. WSU is a major public university that provides on-campus housing for thousands of residents. The relevant certificates give WSU the right to pump over 971 million gallons of water per year to service its large population, and Ecology's report prepared in 1962 in response to WSU's permit application for Certificate No. 5070-A specifically states that the recommended quantity is based on "the anticipated amount required for 15,000 students." Ex. A-11, at 2. Moreover, it is undisputed that WSU's water system far exceeds the necessary number of residential service connections to qualify as a municipal water supplier under the current definition of "municipal water supply purposes." It makes no sense to say that in 1962 and 1963, Ecology issued WSU the right to pump over 971 million gallons of water per year but never intended WSU to use that water for municipal purposes. We refuse to elevate form over substance and overrule *Lummi Indian Nation*. The PCHB correctly confirmed WSU's existing water rights by applying RCW 90.03.560. Under that statute, WSU is deemed to have always been a municipal

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

supplier, and that determination does not violate separation of powers because it upsets no adjudicative facts.

C. *Due Process*

Cornelius next claims that the PCHB violated his due process rights as a junior water user when it "revive[d]" WSU's relinquished senior water rights. Appellants' Opening Br. at 20. He argues the revival moved him "further down the line" of water rights. *Id.* Again, Cornelius's as-applied challenge is a thinly veiled facial challenge and fails.[2]

Cornelius again cites to *Lummi Indian Nation* to support his argument. He claims we held in that case that the MWL did not resurrect rights already lost and that when water right applicants apply to amend their certificates, Ecology is required to determine which water rights have been relinquished pursuant to RCW 90.03.330(2) and RCW 90.44.100. Thus, he argues that here, Ecology unconstitutionally applied the MWL to WSU's water rights because it resurrected a relinquished water right.

---

[2] Cornelius argues a separate procedural due process violation, asserting that "[t]he PCHB's limitation on Cornelius' impairment evidence prejudiced his ability to protect his rights in violation of procedural due process." Appellants' Opening Br. at 20. He fails to cite to the record or provide details about how the PCHB limited his evidence, and he merely cites *Motley-Motley, Inc. v. Pollution Control Hearings Bd.*, 127 Wn. App. 62, 110 P.3d 812 (2005), for the broad principle that parties must be prejudiced regarding preparation to establish due process violations in administrative proceedings. *Id.* We will not reach arguments unsupported by adequate argument and authority. *Saunders v. Lloyd's of London*, 113 Wn.2d 330, 345, 779 P.2d 249 (1989).

16

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

We disposed of this argument in *Lummi Indian Nation*. We held in *Lummi Indian Nation* that merely relabeling a previously granted water right as "municipal" does not violate due process, provided the water user falls under the new municipal definition. *See* 170 Wn.2d at 265-67. We stated,

> [T]hese amendments confirm what the department has already declared (that certain water rights are rights in good standing) and statutorily define something that had previously been statutorily undefined (the meaning of municipal water supplier). RCW 90.03.015, .260, .330, .386, .560. Of themselves, these changes to the law do not violate due process.

*Id.* at 266-67. Here, Ecology merely applied RCW 90.03.560 and RCW 90.03.015 retroactively to WSU to determine that WSU's water rights were valid and met the definition of "municipal water supply purposes." 4 AR Doc. 85, at 14-15 (Order on Summ. J.). This is precisely the kind of action we found constitutional in *Lummi Indian Nation*. If we ruled for Cornelius, Ecology would regularly violate a junior water right holder's due process rights when it applied RCW 90.03.560 to amend a senior municipal holder's water right, the precise argument we rejected in *Lummi Indian Nation*.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

While there may be an unconstitutional application of the MWL, we find none in this case.[3] Cornelius's water rights are junior to WSU's. As observed in *Lummi Indian Nation*, "Junior rights holders always take their water rights subject to the risk that there may be *no* water to fulfill those rights." 170 Wn.2d at 267 (emphasis added). We do not mean to minimize Cornelius's need for water and realize that Washington's prior appropriation water law system can lead to unpleasant outcomes. However, it is the legislature's prerogative to categorize water uses and decide which categories will be relinquished by nonuse. It has done so with the MWL, and under the MWL, Cornelius's claim fails.

2. *Ecology's Streamlined Process*

Cornelius next argues that the PCHB erred in approving Ecology's streamlined process for evaluating WSU's application. Specifically, he claims that the streamlined process conflicts with the MWL's requirement that when a person applies to amend his or her water right, Ecology must conduct a tentative determination of the extent and validity of the water right. He concludes from that requirement that the streamlined process is ultra vires because it contradicts our water laws. His claim

---

[3] If Ecology applied the MWL in a way that invalidated an individual's vested water right, it might well violate due process. *See Lummi Indian Nation*, 170 Wn.2d at 268-69. But junior rights holders always take their rights subject to the possibility that senior rights holders' use will limit, possibly severely, the amount of water available. That is a consequence of scarcity, not a due process violation.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

suffers from the same erroneous characterization of the MWL we outlined above and fails.

An agency's policy is ultra vires if it exceeds its statutory authority. *S. Tacoma Way, LLC v. State*, 169 Wn.2d 118, 122-23, 233 P.3d 871 (2010). The parties agree that when someone applies to amend their certificates or change the manner or place of use of the water, Ecology must conduct a tentative determination of the extent and validity of the applicant's water rights pursuant to RCW 90.44.100. We accept their agreement for the limited purposes of deciding the issue presented. Tentative determinations generally include Ecology staff examining an applicant's historic water use, often looking at year-to-year use, to determine if the applicant relinquished rights. However, Ecology has a streamlined policy for making "simplified" tentative determinations when relinquishment is not an issue. 2 AR Doc. 23, Ex. 2, at 3 (Decl. of Patrick Kevin Brown in Supp. of WSU's Mot. for Partial Summ. J.). Under this streamlined policy, Ecology's staff does not generally require applicants to demonstrate their year-to-year water use because relinquishment is not an issue. Intuitively, instances where Ecology permits the streamlined policy would include when the water right is for a municipal water supply under RCW 90.03.330(3), since those rights are immune from relinquishment. RCW 90.14.140(2)(d).

Here, Ecology made a simplified tentative determination of some of WSU's water rights, which Cornelius challenges, arguing that the MWL still required

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

Ecology to look at WSU's historic nonuse of its water rights and revoke any relinquished rights.

Accepting Cornelius's argument would require us to ignore RCW 90.03.560 and our holding in *Lummi Indian Nation*. Here, Ecology appropriately applied RCW 90.03.560 and RCW 90.03.015 retroactively to WSU to determine that WSU's water rights were valid and met the definition of "municipal water supply purposes." 4 AR Doc. 85, at 14-15 (Order on Summ. J.). Ecology applying the streamlined policy to WSU is consistent with the MWL because WSU's water rights were for municipal water supply purposes and immune from relinquishment. Accordingly, Ecology's action was not ultra vires and Cornelius's claim fails.

3. *Amending Certificates To Add Well Locations*

Cornelius next challenges the PCHB's summary judgment order allowing WSU to amend its certificates to add well locations under RCW 90.44.100. He argues that under our decision in *R.D. Merrill Co. v. Pollution Control Hearings Bd.*, 137 Wn.2d 118, 969 P.2d 458 (1999), in order to amend a certificate, the water right documented by the certificate must be completely perfected. And, because three of WSU's certificates involve water rights that WSU never fully perfected, the certificates could not be amended. Cornelius's argument is based on a misunderstanding of the MWL and fails.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

RCW 90.44.100 authorizes individuals to apply to amend their permits or certificates to add well locations. RCW 90.44.100(1). In *R.D. Merrill*, we said that because RCW 90.44.100 includes the word "permit," it expressly does not require applicants to perfect their water rights through beneficial use before they can amend a groundwater permit. 137 Wn.2d at 130. That case did not involve certificates or water rights for municipal supply purposes. *See id.*

The plain language of RCW 90.44.100 and the logic of our decision in *R.D. Merrill*, combined with the operation of the MWL, allows water users who possess unperfected water rights documented by certificates to amend them to add well locations, at least where the certificates were originally based on system capacity and were for municipal supply purposes. RCW 90.44.100 itself does not require certificate holders to perfect any unperfected rights before amending them to add well locations. In *R.D. Merrill*, we allowed permit holders to amend their unperfected rights specifically because the statute mentioned "permit" and thus contemplated that permit holders need not have beneficially used water. 137 Wn.2d at 130. Although we hinted that in the certificate-holder context, water would likely need to be put to beneficial use before it could be amended under RCW 90.44.100, it was because certificates issue only once water has been put to beneficial use—not because RCW 90.44.100 requires it. *Id.* at 133. In other words, in many cases, certificate holders would need to put their water rights to beneficial use because if they failed to do so,

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

Ecology could find those rights relinquished under RCW 90.44.100 once the applicant applied to amend. *See id.* at 133 n.7. But, in scenarios involving system capacity certificates for municipal supply purposes, relinquishment is simply not an issue. System capacity certificates for municipal supply purposes represent rights "in good standing," i.e., the water rights are deemed perfected, even if the rights were not actually put to beneficial use. RCW 90.03.330(3).

As discussed above, WSU's water rights are represented by system capacity certificates for municipal supply purposes. Thus, WSU did not need to take any action to fully perfect its rights before amending them under RCW 90.44.100 because they are deemed perfected. Accordingly, Cornelius's claim fails.

4. *SEPA*

Cornelius next argues that Ecology failed to comply with SEPA when it processed WSU's applications. The PCHB granted Ecology's summary judgment motion on this issue, and Cornelius appeals, arguing that Ecology should have supplemented its SEPA review. His claim fails.

SEPA is a procedural law that ensures state agencies, among others, consider environmental impacts and alternatives before taking certain actions. *Save Our Rural Env't v. Snohomish County*, 99 Wn.2d 363, 371, 662 P.2d 816 (1983). If no categorical exemption from SEPA exists, the relevant agency or actor proposing a development must meet certain environmental review and documentation

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

requirements. WAC 197-11-310. First, applicants must prepare an "environmental checklist" to describe basic information about a proposal's environmental impacts. WAC 197-11-960. The responsible agency[4] reviews the checklist to determine if an environmental impact statement (EIS) is required. WAC 197-11-330. An EIS is required if the responsible agency reasonably believes that a proposal may have a significant adverse impact on the environment. WAC 197-11-330(4). If the agency determines that the action will not significantly impact the environment, the agency issues a determination of nonsignificance (DNS), which ends the environmental review. WAC 197-11-340; 24 TIMOTHY BUTLER & MATTHEW KING, WASHINGTON PRACTICE: ENVIRONMENTAL LAW AND PRACTICE § 17.3, at 195 (2d ed. 2007). Even if the agency issues a DNS, though, it must create a supplemental EIS or prepare a new "determination" if "[n]ew information" indicates the proposed action may significantly affect environmental quality. WAC 197-11-600(3)(b)(ii). "New information" includes discovering misrepresentation or the lack of material disclosure. *Id.* The agency's determination is entitled to "substantial weight." RCW 43.21C.090. We apply the "clearly erroneous" standard of review to an agency's DNS. *Norway*

---

[4] Meaning the agency that seeks to develop or the agency that is presented with a proposal for development. *See* WAC 197-11-050. If more than one agency is involved, a lead agency must be designated. WAC 197-11-050. The lead agency is the one with the main responsibility for complying with SEPA's procedural requirements, and it is also responsible for preparing environmental impact statements. WAC 197-11-050(2).

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Hill Pres. & Prot. Ass'n v. King County Council*, 87 Wn.2d 267, 275-76, 552 P.2d 674 (1976).

Here, WSU was the lead agency, and it prepared an environmental checklist and issued a DNS. The checklist and DNS did not address whether WSU, by integrating its water system, would increase groundwater withdrawals and exacerbate the declining water level in the aquifer. When Ecology processed WSU's application, it relied on WSU's DNS without adding a supplemental EIS or preparing a new determination. Cornelius argues that when Ecology allowed WSU to amend and integrate its water system, it expanded WSU's water rights, allowing it to pump more groundwater than legally allowed. He claims Ecology was thus obligated under SEPA to supplement WSU's DNS based on the "'new information'" of WSU's increased pumping capacity and its impact on the aquifer. Appellants' Opening Br. at 33.

Cornelius's argument is unpersuasive. As we stated above, Ecology and the PCHB did not expand WSU's water rights in approving WSU's application; rather, they confirmed WSU's rights by applying RCW 90.03.560. The PCHB correctly noted that the amendment does not allow WSU to pump any more water than it currently has a vested right to pump—it merely allows WSU to more cost effectively utilize its existing rights. Thus, Ecology did not need to supplement WSU's DNS

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

because there was no "new information." Accordingly, we affirm the PCHB's summary judgment order on this issue.

## 5. *Impairment and Public Welfare*

Cornelius next argues that through its "unconstitutional interpretation of the MWL," the PCHB improperly limited the evidence and argument that would, he contends, have shown that amending WSU's water rights certificates would impair existing rights and be detrimental to the public welfare. *Id.* at 34. Cornelius's claim is meritless because it is predicated on the same flawed argument that WSU's water rights are being expanded under the MWL that we rejected above. Properly understood, the PCHB did not expand or revive relinquished water rights; rather, it confirmed WSU's existing water rights. Accordingly, Cornelius's claim fails.

## 6. *Safe Sustaining Yield*

Cornelius next argues that when WSU applied to amend its water rights certificates, RCW 90.44.130 required Ecology to determine if WSU's proposal would maintain a safe sustaining yield of groundwater. *Id.* at 35. Cornelius's claim again fails.

Generally, RCW 90.44.130 protects "prior appropriator[s]," i.e., senior water users, from subsequent appropriators overdrafting public groundwater. The statute protects senior users by giving Ecology the power to limit subsequent appropriators'

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

withdrawals to an amount that will "maintain and provide a safe sustaining yield in the amount of the prior appropriation." RCW 90.44.130.

Here, Ecology did not apply the safe sustaining yield provision to WSU and interpreted the statute to mean that the safe sustaining yield requirement applies only to new applications for water rights, not to applications to amend existing water rights certificates. The PCHB agreed with Ecology's interpretation. Cornelius argues Ecology's interpretation was erroneous for two reasons. First, he contends Ecology's erroneous interpretation stems from its unconstitutional interpretation of the MWL expanding WSU's rights. For the reasons above, we reject this argument. Second, he contends that whenever an existing water user seeks to amend his or her water rights, RCW 90.44.130 broadly mandates that Ecology limit the user's groundwater to maintain a safe sustaining yield for other users—the statute does not apply only when Ecology evaluates new permits. We disagree.

Although RCW 90.44.130 clearly protects senior water users against overdrafting by subsequent users, it is unclear whether the senior users' enjoyment of a "safe sustaining yield" applies only to new users who wish to appropriate water or if it applies to existing users who seek to amend. However, here, that is an academic question. WSU is the senior water user, not Cornelius. Thus, Ecology and the PCHB did not err by not applying the safe sustaining yield provision to WSU.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

7. *Reasonable Diligence*

Cornelius again challenges the formally inchoate portions of several of WSU's water rights, this time arguing that they are invalid because they were not put to beneficial use with "reasonable diligence." Appellants' Opening Br. at 37. Cornelius's claim again fails.

When individuals apply to amend their water rights certificates under RCW 90.44.100, rights represented by system capacity certificates for municipal supply purposes are rights "in good standing," i.e., the rights are deemed perfected, even if they were not actually put to beneficial use. RCW 90.03.330(3). However, although the water need not actually have been put to beneficial use for the rights to remain in good standing, the water rights must still be "prosecuted with reasonable diligence" to remain valid. RCW 90.03.460. What constitutes reasonable diligence depends on the circumstances, including the magnitude of the project, the engineering and physical features to be encountered, and public interests. RCW 90.03.320. Another circumstance relevant in the municipal supply purposes context is "delays that may result from planned and existing conservation and water use efficiency measures." *Id.* One of the purposes of the reasonable diligence requirement is to avoid a party speculating in water rights (i.e., acquiring water rights for future profit rather than specifically intending to apply them to a beneficial use). *See R.D. Merrill*, 137 Wn.2d at 130-31.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

Here, four of WSU's water rights are at issue, represented by Certificate Nos. 5070-A, 5072-A, and G3-22065C, and Permit No. G3-28278P. WSU has not historically used the quantity of water listed on those certificates and the one permit since the priority dates of those water rights—1962, 1963, 1973, and 1987 respectively. Thus, WSU has not put to beneficial use the full extent of those water rights for several decades. There is no evidence that WSU is speculating its water rights for profit; WSU exclusively exercises its rights to serve its Pullman campus. Over those decades, WSU has developed as an institution, increasing its enrollment and developing additional facilities. Even with this growth, in recent years WSU's water use has actually declined because it has taken water conservation measures.

Here, we find WSU has exercised reasonable diligence. Although in other circumstances failing to use the full extent of one's water rights for decades might not meet the reasonable diligence requirement, here WSU meets the requirement because of its unique situation and development throughout the decades. WSU is a large public institution that has developed new facilities and increased enrollment over the years. It is in the unusual position of being unable to predict or plan its own growth because its budget and enrollment targets are largely controlled by the legislature. Additionally, WSU is not speculating its water rights, and it has not exercised the full extent of its rights at least in part because of water conservation measures. Considering these circumstances, taking away WSU's water rights for lack of

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

reasonable diligence would hinder WSU's ability to educate students, and it would essentially punish WSU for taking water conservation measures. Accordingly, WSU exercised reasonable diligence and Cornelius's claim fails.

8. *Abandonment of Claim No. 98523*

Cornelius next argues that WSU abandoned its water right represented by Claim No. 98523. His claim fails.

"Abandonment is the intentional relinquishment of a water right." *Okanogan Wilderness League, Inc. v. Town of Twisp*, 133 Wn.2d 769, 781, 947 P.2d 732 (1997). Abandonment requires a two-part showing: nonuse plus an intent to abandon the water right. *See id.* The party alleging abandonment has the burden of proof. *Id.* However, "long periods of nonuse raise a rebuttable presumption of intent to abandon" a water right, and the burden shifts to the water right holder to give reasons justifying the nonuse. *Id.*

Here, WSU filed Claim No. 98523 in 1974, and the claim identifies WSU's Well No. 2 as the source or point of withdrawal. The water right represented by this claim has a priority date of 1938, which is also the year Well No. 2 was drilled. WSU stopped using Well No. 2 as a water source in 1978 because of a misaligned hole and low water level, and WSU decommissioned the well in 1995, using it as a monitoring well instead. WSU's 2002 Water System Plan formally denoted Well No. 2 as being abandoned. However, WSU's 2002 Water System Plan also identified Claim No.

98523 as an existing water right, listing quantities of water for its current and forecasted water right tables. When WSU prepared its applications to amend its water rights, the responsible employee corresponded with Ecology, and the employee assumed that WSU's abandonment of Well No. 2 meant that WSU had abandoned the water right itself. Ecology informed the employee that when a person abandons a well, he or she does not necessarily abandon the associated water right.

Cornelius argues he demonstrated a long period of nonuse because WSU ceased using Well No. 2 in the late 1970s, and he says that unauthorized pumping from other wells cannot make up for WSU not using Well No. 2. He argues WSU cannot rebut the presumption of an intent to abandon Claim No. 98523 because WSU listed Well No. 2 as abandoned and WSU (through its agent employee) assumed Claim No. 98523 was abandoned.

Assuming without deciding that Cornelius demonstrated a long period of nonuse, WSU demonstrated that it did not intend to abandon Claim No. 98523. Cornelius's argument heavily relies on *Okanogan Wilderness League*. In that case, the town of Twisp had a water right dating back to 1912 to divert water from the Twisp River. *Id.* at 772. At least since 1948, Twisp stopped diverting from the river and instead drew water from wells in the town. *Id.* When Twisp belatedly applied for groundwater certificates for the wells in 1967 and 1971, "it did not mention the 1912 water right even though the application forms asked whether there were any other

water rights appurtenant to the lands served by the groundwater withdrawals." *Id.* at 783. In the 1990s, Twisp applied to Ecology for a new water right and an Ecology employee discovered a certificate for the 1912 right. *Id.* at 773. Twisp then sought to use the discovered 1912 right to withdraw water from two new wells. *Id.* The only evidence Twisp had that it did not abandon the 1912 water right was Twisp's continuing existence and need for a water supply. *Id.* at 784. We found Twisp's showing inadequate and held that Twisp abandoned the 1912 right. *Id.* at 786.

Here, WSU shows it did not intend to abandon Claim No. 98523. Unlike Twisp in *Okanogan Wilderness League*, where Twisp apparently forgot it had the 1912 right and failed to list the right on subsequent applications, here WSU never forgot about Claim No. 98523. Although WSU listed the claim's associated well as abandoned in 2002, it also stated that the water right represented by the claim existed, listing quantities of water for its current and forecasted water right status tables. The record indicates WSU's employee's mistake about Claim No. 98523 being abandoned was a theoretical concern he had while preparing WSU's applications to amend its water rights, not a demonstration of an intent to abandon the claim. Accordingly, WSU did not abandon Claim No. 98523 and Cornelius's claim fails.

9. *Beneficial Use and Reasonable Efficiency*

Cornelius next argues that the PCHB erred in granting WSU's summary judgment motion on whether WSU's irrigation of its golf course complied with beneficial use requirements. We disagree.

In water law, "beneficial use" encompasses two principles. *In re Rights of Surface & Ground Waters of Marshall Lake & Marshall Creek Drainage Basin*, 121 Wn.2d 459, 468, 852 P.2d 1044 (1993). First, "beneficial use" refers to the types of activities for which water may be used (e.g., irrigation or agriculture). *Id.* Second, "beneficial use" determines the measure of a person's water right (i.e., a person is entitled to the amount of water he or she has traditionally put to beneficial use). *Id.* Closely related to the idea of beneficial use is an appropriator's duty to avoid waste—when someone appropriates water to beneficial use, that appropriation must be reasonably (not absolutely) efficient. *Id.* at 472. Whether a beneficial use is reasonably efficient turns on a variety of factors, such as local custom, the relative efficiency of irrigation systems in common use, and the costs and benefits of improvements to irrigation systems. *Id.* at 475.

Here, Cornelius originally alleged that WSU's irrigation of its golf course did not meet the reasonable efficiency requirement for beneficial use. WSU moved for summary judgment, and to defeat WSU's summary judgment motion, Scott Cornelius submitted a declaration describing personal observations he made of WSU's golf

32

course while driving or bicycling past it, including photographs and temperature data.

In his declaration, Scott Cornelius says he saw, among other things, sprinklers

operating during the day when local temperatures were in the 90s and water runoff on

hillsides adjacent to the golf course. The PCHB granted WSU's summary judgment

motion, saying that Scott Cornelius's personal observations could not meet his burden

of showing a triable issue of fact regarding reasonable efficiency according to the

relevant legal factors in *Rights of Surface & Ground Waters*. Additionally, the PCHB

stated that Scott Cornelius's "allegations may be more properly evaluated in the

context of an enforcement action." 4 AR Doc. 85, at 28 (Order on Summ. J.).

Cornelius now argues that the PCHB erred by (1) applying the wrong summary

judgment standard by ruling that expert testimony was required to defeat summary

judgment and (2) ruling that Ecology lacks the authority to evaluate reasonable

efficiency when it reviews groundwater amendment applications (i.e., that reasonable

efficiency can be reviewed only in an enforcement action).

Cornelius's arguments fail. First, the PCHB did not rule that expert testimony

was required to defeat summary judgment. Rather, it said that "the observations of

Scott Cornelius, who is admittedly not an expert in this area, along with the

photographs and temperature data, fail to establish a genuine dispute about the

reasonable efficiency of WSU's water use." *Id.* The PCHB properly found Scott

Cornelius's observations insufficient to show triable questions of fact regarding

reasonable efficiency according to the relevant legal factors in *Rights of Surface & Ground Waters*. Scott Cornelius's personal observations about the sprinklers tell us nothing about local custom, the relative efficiency of commonly used irrigation systems, or costs and benefits associated with improvements to irrigation systems— the relevant legal inquiries under *Rights of Surface & Ground Waters*. At best, Scott Cornelius's evidence establishes that WSU's sprinkler system is not absolutely efficient, which is not required for reasonable efficiency. Accordingly, his challenge fails.

Second, the PCHB did not rule that Ecology lacked the authority to evaluate reasonable efficiency when it reviews groundwater amendment applications. The PCHB merely stated that it thought Scott Cornelius's "allegations may be more properly evaluated in the context of an enforcement action," not that Ecology lacked the authority to evaluate reasonable efficiency. *Id.* Thus, Cornelius's second argument is based on a misunderstanding of the PCHB's summary judgment order. Accordingly, Cornelius's claims fail.

10. *Permit No. G3-28278P*

Cornelius next argues that the PCHB erred when it ruled after a hearing that Ecology was not required to reduce the water quantity authorized under Permit No. G3-28278P. Cornelius claims that because Permit No. G3-28278P is supplemental to Claim No. 098524 (which Ecology found invalid), Ecology should have subtracted

34

the water quantity associated with Claim No. 098524 from Permit No. G3-28278P. We disagree.

The groundwater code contains a prohibition on enlargement of rights. *See* RCW 90.44.100(2)(c). It prohibits Ecology from authorizing additional wells as points of withdrawal if the combined total withdrawal from the original and additional well enlarges the rights conveyed by the original permit or certificate. *Id.* We will grant relief from an agency order resulting from an adjudicative proceeding if the order is not supported by substantial evidence. RCW 34.05.570(3)(e). "[S]ubstantial evidence is 'a sufficient quantity of evidence to persuade a fair-minded person of the truth or correctness of the order.'" *King County v. Cent. Puget Sound Growth Mgmt. Hr'gs Bd.*, 142 Wn.2d 543, 553, 14 P.3d 133 (2000) (quoting *Callecod v. Wash. State Patrol*, 84 Wn. App. 663, 673, 929 P.2d 510 (1997)).

Here, Ecology issued a report of examination (ROE) regarding Permit No. G3-28278P, informing WSU that the permit is "for supplemental water only" and that the "waters to be appropriated from Well No. 7 will serve to replace, as necessary, those waters originally authorized or claimed for appropriation from Wells No. 1, 3 and 4." Ex. A-26, at 3. In other words, Ecology granted the permit to supplement the water WSU was already authorized to appropriate under its primary water rights. The permit itself contains the following language:

> The quantities granted under this permit are issued less those
> amounts appropriated under Ground Water Certificate No. 5070-A and

Ground Water Claims No. 098522 and No. 098524. The total combined withdrawal under this permit and Ground Water Certificate No. 5070-A shall not exceed 2500 gallons per minute, 2260 acre feet per year.

Ex. A-25, at 2. The PCHB conducted a hearing to determine whether Ecology meant "supplemental" to mean that the water right represented by Permit No. G3-28278P was valid only to the extent that the primary (older) water rights were valid, or whether "supplemental" meant that the permit was an alternate way for WSU to appropriate its previously authorized rights. 4 AR Doc. 89, at 30-31 (Findings of Fact, Conclusions of Law & Order). After examining the language in the permit and the ROE, the PCHB determined that Permit No. G3-28278P was intended as an alternate source of water for WSU and that the amount of water authorized under the permit was not legally dependent on WSU's existing water claims. Thus, the PCHB did not require WSU to subtract the amount of water authorized in invalid Claim No. 098524 from Permit No. G3-28278P because the permit merely represented an alternate source of water for WSU. Cornelius claims the PCHB erred, arguing that the permit's validity depends on the preexisting water rights' validity.

Cornelius contends that the permit's language and its status as "supplemental" necessarily means that the permit's validity depends on the preexisting water rights' validity. We find that the evidence the PCHB relied on—the language of the permit itself—is sufficient to persuade a fair-minded person of the truth or correctness of the

36

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

finding. Accordingly, the PCHB's finding is supported by substantial evidence and Cornelius's claim fails.

11. *Attorney Fees*

Cornelius requests attorney fees pursuant to RCW 4.84.350. That statute allows for attorney fees when a qualified party prevails in judicial review of an agency action. Here, Cornelius does not prevail. Thus, we deny the request for attorney fees.

CONCLUSION

The legislature substantially amended this state's water law in 2003, categorizing water uses and deciding which categories would be relinquished through nonuse. In *Lummi Indian Nation*, we found those amendments facially constitutional. We find the amendments were constitutionally applied in this case and reject Cornelius's remaining claims. We affirm.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Cornelius v. Dep't of Ecology*
No. 88317-3

WE CONCUR:

*Cornelius v. Wash. Dep't of Ecology, et al.*

No. 88317-3

MADSEN, C.J. (dissenting)—It is well settled Western water law, as well as the law of this state, that municipal uses were not the same as domestic and community domestic and stock water uses under Washington law prior to the 2003 amendment of our state water laws, and a water right granted in the early 1960s for domestic and community domestic and stock water uses was not a right to put water to municipal use. Recognizing the rising demand for water and the scarcity[1] of this natural resource, in

---

[1] Washington State relies on melting glaciers to provide 1.8 trillion liters (470 billion gallons) of water each summer. *See* NAT'L SNOW & ICE DATA CTR.: FACTS ABOUT GLACIERS, http://nsidc.org/cryosphere/glaciers/quickfacts.html (last visited Jan. 6, 2015). However, glaciers in the North Cascades have lost 18 to 32 percent of their total volume since 1983 and have shrunk by 50 percent in the last century, placing them at levels not seen in 4,000 years. *See* WASH. STATE DEP'T OF ECOLOGY, FACTS ABOUT WASHINGTON'S RETREATING GLACIERS AND DECLINING SNOWPACK, (*available at* https://fortress.wa.gov/ecy/publications/publications/0711016.pdf); *All Things Considered: Shrinking Glaciers Could Squeeze Washington's Water Supply*, Nat'l Pub. Radio (Nov. 21, 2014) (transcript available at http://www.npr.org/templates/transcript/transcript.php?storyId=365762034). The average mountain snowpack in the North Cascades (critical to summer streamflows) has declined at 73 percent of mountain sites studied since 1983, and spring runoff is occurring earlier each year. *See* FACTS ABOUT WASHINGTON'S RETREATING GLACIERS, *supra*. Washington's population has doubled over the past 50 years, and our current population of 6.5 million is expected to increase by nearly 2 million by the year 2030, dramatically increasing the demand for water. *See* WASH. ENVTL. COUNCIL REPORT, BEFORE THE WELL RUNS DRY: WATER SOLUTIONS FOR WASHINGTON, *available at* http://wecprotects.org/publications/before-the-well-runs-dry-water-solutions-

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

1967 the legislature enacted relinquishment statutes subjecting water rights issued for community domestic and stock water uses and domestic uses to relinquishment.[2]

Rather than properly applying the relinquishment statutes to the water rights at issue here, the majority instead applies the 2003 laws governing municipal water uses to recharacterize domestic uses to mean municipal uses and thus defeat statutory relinquishment. This application of the 2003 amendment conflicts with relinquishment statutes and fails to recognize the important policy decisions underlying these statutes.

Consistent with our prior decision in *Lummi Indian Nation v. State*, 170 Wn.2d 247, 241 P.3d 1220 (2010), I would hold that the relinquished rights in question cannot be resurrected. In holding otherwise, the majority fails to give effect to the relinquishment statute, misapplies the 2003 amendments, and unsettles legitimate

---

for/Before%20the%20well%20runs%20dry.pdf. In the Puget Sound region alone, the population is projected to increase by over 1 million people in the next 20 years. *Id.*

[2] Noting that the "future growth and development of the state is dependent upon effective management and efficient use of the state's water resources," the legislation's stated purpose is in relevant part "to cause a return to the state of any water rights which are no longer exercised by putting said waters to beneficial use." LAWS OF 1967, ch. 233, § 1. The legislature found "[e]xtensive uncertainty" as to the volume of private claims to water in the state and that such uncertainty "seriously retards the efficient utilization and administration of the state's water resources, and impedes the fullest beneficial use thereof." *Id.* § 2(1), (2). The legislature further found that "[a] strong beneficial use requirement as a condition precedent to the continued ownership of a right to withdraw or divert water is essential to the orderly development of the state"; that "[e]nforcement of the state's beneficial use policy is required by the state's rapid growth"; that "[a]ll rights to divert or withdraw water . . . must be subjected to the beneficial use requirement"; and that "[t]he availability for appropriation of additional water as a result of the requirements of this act will accelerate growth, development, and diversification of the economy of the state." *Id.* § 2.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

expectations of water users in an already overappropriated water system.[3] I respectfully dissent.

## Discussion

In *Lummi Indian Nation*, we held that legislation enacted in 2003 governing municipal water supplies and suppliers was not facially unconstitutional. However, we recognized that as-applied constitutional claims might prevail if vested rights were affected by application of the 2003 amendments. This is the as-applied challenge we anticipated in *Lummi*.

The appellants here[4] assert due process and other challenges to the 2003 legislation as applied to water right certificates issued to Washington State University (WSU) in the 1960s for domestic and community domestic and stock water uses. Appellants assert that the 2003 legislation was applied to redefine the legal character of these water rights, transforming them into valid rights for municipal water supply purposes. Appellants argue that absent application of the 2003 legislation, these water rights were subject to statutory relinquishment[5] under chapter 90.14 RCW and had, indeed, been relinquished, in whole or in part.

I would reverse and remand this case to the Washington Pollution Control Hearings Board (Board) for reconsideration of appellants' claims of statutory

---

[3] It is undisputed that long-term declining water levels in the Grand Ronde Aquifer threaten all of the water users in the basin if not addressed adequately.

[4] The appellants are Scott Cornelius, the Palouse Water Conservation Network, and the Sierra Club Palouse Group.

[5] Statutory relinquishment is also referred to as forfeiture.

No. 88317-3
Madsen, C.J., dissenting

relinquishment, with directions that the 2003 legislation cannot be applied to change the character of the water rights granted for domestic and community domestic and stock water uses to preserve water rights lost for failing to put the water to beneficial use.

Relevant Facts

In 2004, WSU applied to the Washington Department of Ecology for changes to all of its existing water rights that WSU holds to provide water to its primary campus. WSU is the state's land grant institution of higher education, with its primary campus located within the limits of the city of Pullman, Washington. WSU operates its own water system that serves the campus. All of the water that is supplied is withdrawn from WSU's wells, except for an emergency intertie with the city of Pullman.

WSU's applications in effect sought to permit water authorized under any of its water rights to be withdrawn from any of its wells. The goal was to bring the university's water rights into conformance with the in-fact consolidation of these rights that had occurred over time. Between 1935 and 1983, WSU was issued four water rights and it registered three claims for groundwater rights obtained prior to enactment of the groundwater code in 1945. WSU has drilled and operated eight wells. Eventually, WSU was pumping water from the wells into one integrated water system divided into two distribution zones. Also, as time has passed, WSU has consolidated its well operations, shifting pumping away from older wells as it brought new wells online. WSU never obtained authorization to use its water rights in an integrated system, and the university's withdrawal of water from each of the individual wells has not matched the quantity of

4

water authorized to be withdrawn from the well, either historically or at present. In recent years, WSU has withdrawn water through only three of its wells: Wells 6, 7, and 8.

In the early 2000's, Gary Wells, an engineer in WSU's facilities operations division, began working on a water rights change proposal because WSU's system was aging and largely dependent on one well, Well 7. Wells was concerned about being able to provide sufficient water for the campus if Well 7 became inoperable.

WSU provided notice of its applications to change its water rights, and Scott Cornelius and the Palouse Water Conservation Network objected to the change requests. In 2006, Ecology approved the proposed amendments for six of the rights but determined that one of the claims, Claim No. 098524, was invalid. As to the other water rights, Ecology applied the legislation enacted in 2003 that addresses municipal water supplies and suppliers.[6] Ecology found that all of WSU's remaining claimed rights are for "municipal water supply purposes" as defined by the new statutory provisions.

Appellants appealed to the Board, which resolved most of the issues against appellants on summary judgment. The Board decided that it lacked jurisdiction to address appellants' constitutional challenges, characterizing them as tantamount to facial challenges. Following a hearing on the three issues not decided on summary judgment, the Board issued its final order in April 2008 and subsequently denied reconsideration.

---

[6] The parties refer to the body of 2003 legislation concerning municipal water as the "Municipal Water Law" or "MWL," a name that is apparently used for convenience since it is not a title appearing in the bill containing the amendments and new statutes. *See* LAWS OF 2003, 1st Sp. Sess., ch. 5.

As the Board found, groundwater is the primary source of water for WSU, the city of Pullman, the city of Moscow, Idaho, the University of Idaho, and the surrounding areas in Whitman County, Washington, and Latah County, Idaho. In the 1990s, the two universities and the two cities endorsed individual plans to reduce impacts of their groundwater withdrawals. WSU's water use has been below annual targets, and in 2005, WSU's water use was below the amount used in 1992, when efforts began to limit pumping.

WSU withdraws its water from the Grande Ronde Aquifer. It is undisputed, and the Board found, that long-term declining water levels in the Grand Ronde Aquifer threaten all of the water users in the basin if not addressed adequately. At the present time, the only recognized way to slow or reverse the aquifer decline is to reduce the withdrawal of water from it.

Appellants appealed the Board's decision to Whitman County Superior Court, which affirmed. When appellants' appealed to the Court of Appeals, Division Three certified the case to this court, which we accepted.

Standard of Review

The Washington Administrative Procedure Act (APA), chapter 34.05 RCW, governs proceedings before the Board. An appellate court reviewing a decision of the Board sits in the same position as the superior court and applies RCW 34.05.570's standards of review directly to the agency record. *Dep't of Ecology v. Theodoratus*, 135 Wn.2d 582, 589, 957 P.2d 1241 (1998). Under RCW 34.05.570(3), in relevant part, a

6

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

court may grant relief from an agency order in an adjudicative proceeding if it violates constitutional provisions, is outside the agency's statutory authority, erroneously interprets or applies the law, is not supported by substantial evidence, or is arbitrary and capricious. *See Postema v. Pollution Control Hr'gs Bd.*, 142 Wn.2d 68, 77, 11 P.3d 726 (2000); *Okanogan Wilderness League, Inc. v. Town of Twisp*, 133 Wn.2d 769, 776, 947 P.2d 732 (1997).

Under the error of law standard, a court reviews the agency's interpretation and application of a statute de novo. RCW 34.05.570(3)(d); *Postema*, 142 Wn.2d at 77. If the statute is ambiguous and falls within the agency's special expertise, the agency's interpretation of the statute is given great weight. *Pub. Utility Dist. No. 1 of Pend Oreille County v. Dep't of Ecology*, 146 Wn.2d 778, 790, 51 P.3d 744 (2002); *Postema*, 142 Wn.2d at 77; *Theodoratus*, 135 Wn.2d at 589. At the end of the day, however, it is for the court to determine the meaning and purpose of a statute. *Postema*, 142 Wn.2d at 77; *City of Redmond v. Cent. Puget Sound Growth Mgmt. Hr'gs Bd.*, 136 Wn.2d 38, 46, 959 P.2d 1091 (1998).

A reviewing court "must uphold agency findings unless '[t]he order is not supported by evidence that is substantial when viewed in light of the whole record before the court . . . .'" *R.D. Merrill Co. v. Pollution Control Hr'gs Bd.*, 137 Wn.2d 118, 135, 969 P.2d 458 (1999) (alterations in original) (quoting RCW 34.05.570(3)(e)). We accord deference to agency findings on factual matters. *Id.*; *Penick v. Emp't Sec. Dep't*, 82 Wn. App. 30, 37, 917 P.2d 136 (1996).

7

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

Because many of the issues before the Board were decided on summary judgment, the standards for reviewing summary judgment overlay the APA standards of review. *Verizon Nw., Inc. v. Emp't Sec. Dep't*, 164 Wn.2d 909, 916, 194 P.3d 255 (2008). We make the same inquiry as the Board, and summary judgment is proper when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Postema*, 142 Wn.2d at 119; *see Hertog v. City of Seattle*, 138 Wn.2d 265, 275, 979 P.2d 400 (1999); CR 56(c). Facts and reasonable inferences from the facts are considered in the light most favorable to the nonmoving party. *Postema*, 142 Wn.2d at 119.

The burden of establishing that Ecology's action was invalid is on appellants as the challengers asserting invalidity. RCW 34.05.570(1)(a); *Pub. Utility Dist. No. 1*, 146 Wn.2d at 790; *Postema*, 142 Wn.2d at 78.

Relinquishment

On August 1, 1962, WSU was issued Certificate 5070-A (Well 4) for domestic supply for WSU, with the right quantified at 1500 gallons per minute and 2,260 acre-feet per year. On May 27, 1963, WSU was issued Certificate 5072-A (Well 5) for community domestic supply and stock water, quantified at 500 gallons per minute and 720 acre-feet per year. Appellants maintain that these rights were subject to statutory relinquishment and were relinquished in whole or in part because of nonuse over extended periods of time.

Ecology determined, however, (1) that these rights are for municipal water supply purposes according to the 2003 legislation that specifically defines "municipal water

No. 88317-3
Madsen, C.J., dissenting

supply purposes," RCW 90.03.015(4); (2) that WSU is a "municipal water supplier" as defined, RCW 90.03.015(3); and (3) that each of its rights is for municipal supply purposes according to present beneficial use.[7] Water rights for municipal water purposes are excepted from relinquishment pursuant to RCW 90.14.140(2)(d).[8] Appellants maintain, however, that applying the 2003 definition in RCW 90.03.015(4) to redefine the rights under Certificates 5070-A and 5072-A as rights for municipal water supply purposes, with the result that the relinquishment statutes do not apply, violates due process. I agree with appellants.

Under the relinquishment statutes, any water right holder who, without cause, voluntarily fails to beneficially use all or any portion of the water right for a period of

---

[7] RCW 90.03.015(3) and (4) provide in part:
The definitions in this section apply throughout this chapter unless the context clearly requires otherwise.
. . . .
(3) "Municipal water supplier" means an entity that supplies water for municipal water supply purposes.
(4) "Municipal water supply purposes" means a beneficial use of water:
(a) For residential purposes through fifteen or more residential service connections or for providing residential use of water for a nonresidential population that is, on average, at least twenty-five people for at least sixty days a year . . . . If water is beneficially used under a water right for the purposes listed in (a) . . . of this subsection, any other beneficial use of water under the right generally associated with the use of water within a municipality is also for "municipal water supply purposes," including, but not limited to, beneficial use for commercial, industrial, irrigation of parks and open spaces, institutional, landscaping, fire flow, water system maintenance and repair, or related purposes.

[8] RCW 90.14.140 sets out sufficient cause for nonuse of a water right to except the right from relinquishment. RCW 90.14.140 states in part:
(2) Notwithstanding any other provisions of RCW 90.14.130 through 90.14.180, there shall be no relinquishment of any water right:
. . . .
(d) If such right is claimed for municipal water supply purposes under chapter 90.03 RCW.

9

Madsen, C.J., dissenting

five successive years relinquishes the right or portion of the right. RCW 90.14.160-.180; *Dep't of Ecology v. Acquavella*, 131 Wn.2d 746, 758, 935 P.2d 595 (1997). "Once a party has shown" that a water right holder "has failed to use any or all of its right[s] for five successive years," then the burden is with the right holder to show "its nonuse falls under one of the narrow categories in RCW 90.14.140," here, for municipal supply purposes, RCW 90.14.140(2)(d). *Acquavella*, 131 Wn.2d at 758.

Relinquishment is determined with regard to the time of nonuse, as statute provides and as we have previously recognized. *In re Rights to Yakima River Drainage Basin*, 177 Wn.2d 299, 319, 296 P.3d 835 (2013) ("[a]fter five years of consecutive nonuse of a water right, relinquishment follows unless an excuse for nonuse" applies); *see R.D. Merrill Co. v. Pollution Control Hr'gs Bd.*, 137 Wn.2d 118, 144, 969 P.2d 458 (1999) (recognizing that events occurring after the five year statutory period of a water right's nonuse "in whole or in part" was of no moment because "relinquishment had already occurred"). Such relinquished right "shall revert to the state." RCW 90.14.180; *see also* RCW 90.14.130 (recognizing such reversion).

To demonstrate relinquishment, appellants rely, among other things, on a table documenting the annual volumes of water that WSU pumped in acre-feet from wells, including Wells 4 and 5, the withdrawal points for water under Certificates 5070-A and 5072-A.[9] As to each right, the table shows that water was pumped from Wells 4 and 5

---

[9] This water use table was prepared by WSU's water department staff and has been used by the parties for purposes of this litigation. Second Suppl. Decl. of Gary Wells in Supp. of WSU's

10

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

during some years, but this use either ceased entirely or dropped precipitously during a period of at least five successive years, and in neither case was the right used to the extent of the certificated amount of water.

Although WSU was authorized to withdraw up to 2,260 acre-feet per year under water right Certificate 5070-A from Well 4, it pumped a maximum of only 1090 acre-feet, in 1969, and from 1989 through 2002, it pumped 740 acre-feet per year or less. Second Suppl. Decl. of Gary Wells in Supp. of WSU's Mot. for Partial Summ. J., No. 06-099, Ex. 2 (Pollution Control Hr'gs Bd. Sept. 21, 2007) (2 Admin. R. Doc. 52). WSU was authorized to withdraw up to 720 acre-feet per year under water right Certificate 5072-A but withdrew no water from Well 5 from 1986 to 1995. *Id.*

WSU claims to have switched to pumping water under these rights from unauthorized wells, but the table does not show this. It does not show increased withdrawals from other wells in sufficient quantity to account for its decreased pumping from Wells 4 and 5. Further, the rights WSU held, to withdraw from its wells other than Wells 4 and 5, were rights to amounts that were never fully withdrawn from the other wells, and it is difficult to see how water was withdrawn under Certificates 5070-A and 5072-A from WSU's other wells when the full amount of water under the rights pertaining to the other wells was never withdrawn. Moreover, WSU agrees that it reduced its water use over time. There is no dispute that WSU has never beneficially used the quantities of water authorized under its water rights.

---

Mot. for Partial Summ. J., No. 06-099, Ex. 2 (Pollution Control Hr'gs Bd. Sept. 21, 2007) (2 Admin. R. (AR) Doc. 52).

11

No. 88317-3
Madsen, C.J., dissenting

While there are questions remaining about the total amount that was not used under the water right certificates, there appears to be no question that WSU did not use the full extent of its water rights under Certificates 5070-A and 5072-A for periods of at least five successive years.

WSU contends that the relevant question for purposes of relinquishment is whether a right is "claimed" for municipal purposes and not whether it is "issued" for municipal purposes, relying on the term "claimed" in RCW 90.14.140(2)(d). In full, RCW 90.14.140(2)(d) says that "[n]otwithstanding any other provisions of RCW 90.14.130 through 90.14.180, there shall be no relinquishment of any water right . . . [i]f such right *is claimed for municipal water supply purposes under chapter 90.03 RCW.*" (Emphasis added.)

The complete language of the exception shows what is meant. The exception applies to municipal water rights that have been acquired under the provisions in chapter 90.03 RCW for obtaining a right to use water for municipal water supply purposes.[10] Here, the two certificates of water rights show on their face that when they were acquired, it was for *domestic* and *community domestic and stock* water uses, not municipal uses.

The fact that WSU apparently combined the water from its wells into a consolidated system did not alter the purposes of the water rights it held during the time period that relinquishment occurred. Water rights issued for domestic uses were not

---

[10] RCW 90.44.060 provides that obtaining groundwater permits and rights is governed by RCW 90.03.250 through 90.03.340.

12

No. 88317-3
Madsen, C.J., dissenting

water rights for municipal uses. The definitions section of chapter 90.14 RCW, where the relinquishment statutes are found, draws a distinction between domestic and municipal uses of water in RCW 90.14.031. The statute defines "beneficial use" to include "use for domestic water [and] municipal." RCW 90.14.031. RCW 90.14.140(2)(d), the exception itself, applies to water rights for "municipal water supply purposes" and does not mention or imply that water rights for domestic uses qualify for the exception.

The distinction between domestic uses and municipal uses is reflected in a large body of law in this state and other western states, confirming that the distinction between domestic use and municipal use has long been an elemental concept in water law. And while municipal use might include water for residential, domestic use, the converse has not been true. A water right issued for domestic use was not a water right that encompassed municipal use.

In our state, the distinction continues to be explicitly recognized in numerous statutes aside from chapter 90.14 RCW.[11] In addition, case law in this state has also long

_____

[11] *See, e.g.*, RCW 90.54.020(1), (4) (declarations of fundamental principles for utilizing and managing state waters; "[u]ses of water for *domestic* . . . purposes"; "water for *municipal* . . . beneficial uses" (emphasis added)); RCW 90.66.065(4) (transfers or change in purpose of family farm permits; "[b]efore a change in purpose of a family farm water permit to *municipal supply purpose or domestic purpose* may be authorized . . ." (emphasis added)); RCW 90.38.005(1)(a)-(b) (regarding Yakima River Basin rights; noting intensifying "competition for water among *municipal, domestic*, industrial, agricultural, and [etc.] interests" (emphasis added)), .060 ("agricultural, *municipal, and domestic* water supply" (emphasis added)), .070(4) ("integrated plan to *support future municipal and domestic water needs*" (emphasis added)); LAWS OF 2006, ch. 168, § 1, at 765 (regarding the Odessa groundwater subarea; "continued availability of groundwater for *domestic, municipal*, industrial, and agricultural uses . . . in great jeopardy" (emphasis added)); RCW 89.12.190(1) (regarding Columbia Basin project; "availability of

13

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

recognized the distinction between water for domestic and municipal uses.[12] Moreover, that municipal and domestic uses are distinct is also shown by leading treatises and journals. *See* LINDA A. MALONE, ENVIRONMENTAL REGULATION OF LAND USE § 8:3, at 8-14 (2014) (discussing priorities of water rights and noting that in some states priority may be modified by a system of preferences when there is a shortage or when uses compete; "[t]he usual ranking of preferences is: (1) *domestic*; (2) *municipal use*; (3) irrigation; (4) mining and manufacturing . . ." (emphasis added)); DAN A. TARLOCK, LAW OF WATER RIGHTS AND RESOURCES § 5:66, at 337 (2014) ("[w]estern states have a standard list of purposes for which water may be appropriated[, which] originally included the use of water for *domestic, municipal*, irrigation . . ." (emphasis added)); Jay F. Stein, James C. Brockmann, Cynthia F. Covell & John C. Peck, *Water Use and Reuse: The New Hydrologic Cycle*, 57 ROCKY MT. MIN. L. INST. § 29.02 (2011)

---

groundwater for *domestic, municipal*, industrial, and agricultural uses" (emphasis added)); RCW 90.90.020(3)(d) (Columbia River Basin water supply; "[n]ew *municipal, domestic*, industrial, and irrigation water needs" (emphasis added)); RCW 80.04.010(31) (defining "water system" to include all real estate, fixtures, appliances, and structures used for furnishing "water for power, irrigation, reclamation, manufacturing, *municipal, domestic* or other beneficial uses for hire" (emphasis added)); *see also Clark v. Olso*, 177 Wash. 237, 238, 31 P.2d 534 (1934) (acknowledging that such domestic versus municipal distinction was present in the predecessor "water system" definitional statute in 1934); RCW 90.90.110; RCW 36.145.100(1)(f); RCW 43.99E.010, .025(1).

[12] *See, e.g., City of New Whatcom v. Fairhaven Land Co.*, 24 Wash. 493, 494, 64 P. 735 (1901) (referring to a private corporation supplying Whatcom with "water for general *domestic* and *municipal* use" (emphasis added)); *State v. Superior Court*, 51 Wash. 386, 394, 99 P. 3 (1909) (evidence showed need for "water to supply *the city* of Raymond for sewerage purposes, fire protection, and other *municipal uses*, and also to supply *its inhabitants* for ordinary *domestic uses* in their homes and otherwise, as such use is commonly understood" (emphasis added)); *Okanogan Wilderness League, Inc. v. Town of Twisp*, 133 Wn.2d 769, 772, 947 P.2d 732 (1997) (reciting facts concerning a water right for "*domestic* purposes . . . and for general *municipal* purposes" (emphasis added)).

14

("[w]estern prior appropriation water law is premised on the concept of beneficial use[, and i]n state constitutions, statutes, and administrative regulations, western states recognize and sometimes define various types of water use such as *domestic, municipal,* industrial, irrigation, water power, recreational, and others" (emphasis added)).

Domestic water use has been described thusly:

"Household purposes, including water for drinking, washing, bathing, culinary purposes, and the like; water for such domestic animals as are used and kept about the house, such as work animals and cows kept to supply their owners and their families with dairy products; and such other uses, not being either agricultural or mechanical, as directly tend to secure and promote the healthfulness and comfort of the home."

Robert E. Beck, *Municipal Water Priorities/Preferences in Times of Scarcity: The Impact of Urban Demand on Natural Resource Industries,* 56 ROCKY MT. MIN. L. INST. § 7.02[1] (2010) (quoting *Armstrong v. Larimer County Ditch Co.,* 27 P. 235, 236 (Colo. Ct. App. 1891)).

Municipal water use has been described in this way:

Of the many types of beneficial use, municipal use is the broadest because it encompasses the multitude of uses made of water in a city, from supplying homes, businesses, and industries, to watering lawns and golf courses and providing recreational water in lakes and swimming pools.

Stein et al., *supra.*[13]

---

[13] A more detailed discussion of municipal water uses follows:
Within the scope of public water supply or municipal water supply, almost the full range of uses exists: residential (domestic), governmental (city lands and buildings, institutions, fire protection, sewers), commercial, and industrial. The only two primary uses generally not mentioned are agriculture and mining, although mineral processing could come within industrial use, and mining less clearly within industrial use. Often, early commercial establishments were in the

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

As can be seen, municipal uses may include uses that fall within the domestic uses category, but a water right issued for domestic use did not allow the user to put the water to any and all municipal uses. For example, the holder of a water right for domestic uses would not have been entitled to use the water under the right for a public golf course, although the holder of a water right for municipal uses could do so. In addition, as the preference lists adopted by statute in some of the western states reveal, domestic use has traditionally been regarded as superior in importance.

In sum, there is and has been a basic legal difference between water rights granted for municipal use and water rights granted for domestic use. I recognize that on their face the 2003 statutory provisions concerning municipal water alter the distinction insofar as a particular right now falls under the definition for "municipal water supply" purposes. But here the issue is whether statutory relinquishment occurred prior to these statutes being enacted, and throughout that time the distinction between municipal uses and domestic uses prevailed.

WSU maintains, however, that despite the purposes of use stated on the water rights certificates, the two rights were in fact granted for municipal uses. For example,

---

same structure as the residence. Water was used in the commercial establishment for the same primary uses as in residences—human consumption and sanitation. At some point cities became industrialized, like Pittsburgh, known for steelmaking. Thus municipal and industrial were one because industry was located in urban areas. Add to these governmental uses, such as fire prevention, park maintenance, street washing, and public institutions, and the picture is complete. Today cities may consist largely of residential and commercial habitations and government structures.

Beck, *supra*, § 7.03[2][d] (footnote omitted).

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

WSU relies on language in its application for the right to appropriate water rather than the purpose actually stated on Certificate 5072-A (Well 5) for community domestic supply and stock water. The difficulty is that an applicant could state any number or type of possible proposed uses on an application to appropriate water. What matters is the use for which the water right is granted. Indeed, when a water right certificate is granted for an express purpose that is different from what was requested, it is significant evidence that the requested purpose was rejected.

Moreover, great uncertainty would be introduced into certificated water rights if they can be disregarded in favor of after-the-fact, case-by-case inquiries into the purpose of use that the applicant attempted to obtain. Absent a showing that the issuing agency meant to grant a certificated water right for municipal uses but inadvertently failed to do so, i.e., a scrivener's error or comparable mistake, the purpose of use stated on the certificate must control. *Cf., e.g.*, RCW 90.03.330(2) (providing for adjustment of certificates if ministerial errors are discovered).

WSU additionally points out that its application showed an expectation of increasing future enrollment and points out that the stated quantity of water right in Certificate 5072-A was unnecessary to serve the then-existing population. It should go without saying, after our decision in *Theodoratus*, that Ecology and its predecessor have not always issued water right certificates in accordance with existing statutes.[14] But whether the agency had authority to issue a right for domestic uses in an amount to

---

[14] *See Theodoratus*, 135 Wn.2d at 598 (noting Ecology had "acted ultra vires in utilizing an unlawful system capacity measure of a water right").

17

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

satisfy far-in-the-future predicted expansion is not a matter that must be decided here. The fact is that the two rights at issue are certificated water rights for domestic and community domestic and stock water uses that have never, in the 50 or so years since issuance, been used in amounts anywhere close to the amounts stated on the certificates. The applicable relinquishment statute provides that

> [a]ny person hereafter entitled to divert or withdraw waters of the state through an appropriation authorized under RCW 90.03.330, 90.44.080, or 90.44.090 . . . who voluntarily fails, without sufficient cause, to beneficially use all or any part of said right to withdraw for any period of five successive years shall relinquish such right or portion thereof.

RCW 90.14.180. Nothing in this statute requires that unused water under a certificated right has to first be put to use before the right is subject to relinquishment.

Appellants have presented evidence that WSU relinquished any right it may have had to use the stated amount of water long before 2003, and WSU does not adequately rebut the evidence.

Finally, it should be noted that in other administrative review cases, the Board has addressed relinquishment in connection with water rights that were issued for community domestic purposes, showing that the Board has not equated community domestic use to municipal use. *Olga Water Users, Inc. v. Dep't of Ecology*, No. 08-123, Order Granting Mot. for Summ. J. at 9 (Pollution Control Hr'gs Bd. July 10, 2009) (Board observed that "[f]ive years have not passed . . . , so there has been *no relinquishment* of the *community domestic use portion* of the water right" (emphasis added)); *Ga. Manor Water Ass'n v. Dep't of Ecology*, No. 93-068, Final Findings of Fact, Conclusions of Law, & Order at 20

18

No. 88317-3
Madsen, C.J., dissenting

(Pollution Control Hr'gs Bd. Nov. 9, 1994) ("Ecology's order to show cause why Georgia Manor should not *relinquish* 8 gpm of the 20 gpm authorized for *community domestic use* . . . for more than 5 consecutive years of voluntary nonuse, without sufficient cause, is affirmed" (emphasis added)). The Board's failure to similarly apply the relinquishment statute here was legal error warranting reversal. *Postema*, 142 Wn.2d at 77.

Due Process

The rights under Certificates 5070-A and 5072-A were held as rights to withdraw water for domestic and community domestic and stock water uses. But for Ecology's and the Board's determinations that the 2003 legislation changed their character retrospectively, these rights were not rights to use water for municipal water supply uses and they were subject to relinquishment. This being so, I turn to appellants' constitutional due process claim.

Appellants contend that the Board's application of the 2003 definition of "municipal water supply,"[15] with the result that water rights in Certificates 5070-A and 5072-A were not subject to relinquishment despite extended periods of nonuse prior to 2003, violates due process. Appellants appropriately begin with the court's decision in

---

[15] In upholding Ecology's determinations that the 2003 definition of "municipal water supply purposes" applies, the Board concluded that whether water rights are for "municipal water supply purposes" is determined at the time the right is characterized because the legislature used language defining "municipal water supply purposes" in the "present tense," i.e., "*means* a beneficial use of water." RCW 90.03.015(4) (emphasis added). Definitions in statutes frequently begin with "'X' means . . . ." I do not agree that this shows legislative intent that the definition applies to revive rights lost to relinquishment before the 2003 legislation was enacted.

19

*Lummi*, 170 Wn.2d 247. There, we rejected arguments that the 2003 legislation is facially unconstitutional as violating separation of powers principles and due process.[16] However, we explicitly recognized that as-applied constitutional challenges to the 2003 enactments could be made. *Id.* at 258, 263, 272.[17] We also held:

> "[P]roperty owners have a vested interest in their water rights to the extent that the water is beneficially used on the land." *Dep't of Ecology v. Adsit*, 103 Wn.2d 698, 705, 694 P.2d 1065 (1985) (citing *Dep't of Ecology v. Acquavella*, 100 Wn.2d 651, 655, 674 P.2d 160 (1983)). Vested water rights cannot be deprived without due process of law. *Id.* (citing *Nielson v. Sponer*, 46 Wash. 14, 89 P. 155 (1907)).

*Id.* at 265 (alteration in original).

As a junior water right holder, individual appellant Scott Cornelius's place in line is lawfully subject to impact by senior rights, including those of WSU. But as appellants argue, a junior right holder is protected from impact of senior rights that in law were relinquished because of nonuse. In *Lummi* we reiterated that Ecology can approve changes in water rights only to the extent they are valid. 170 Wn.2d at 270-71 (citing *Merrill*, 137 Wn.2d at 127). We have also observed that groundwater rights cannot be transferred or changed if lost as a result of nonuse. *Merrill*, 137 Wn.2d at 126.

---

[16] Our analysis in *Lummi* turned on the parameters of the "facial challenge" at issue. 170 Wn.2d at 267. We stated, "[T]his is a facial challenge, and a 'facial challenge must be rejected if there are any circumstances where the statute can constitutionally be applied.'" *Id.* (quoting *Wash. State Republican Party v. Wash. State Pub. Disclosure Comm'n*, 141 Wn.2d 245, 282 n.14, 4 P.3d 808 (2000)).

[17] We stated, "[N]othing in this opinion should be taken to forestall a proper 'as applied' challenge." *Id.* at 272. We explained, "Because this is a facial challenge, no case has been pleaded or proved where any individual rights holder's reasonable expectation of the enjoyment of water rights has actually been impaired or deprived in violation of due process of law. *Id.* at 267. The present case is the as-applied challenge that *Lummi* did not address but expressly recognized might be raised.

Madsen, C.J., dissenting

Appellants also argue that consolidation of WSU's water rights in their certificated amounts will increase WSU's access to and ability to pump water from the aquifer.[18] At least to the extent WSU has relinquished part of its rights, they are correct. Appellants also argue that the Board's application of the 2003 laws pertaining to municipal water supply purposes effectively moved Cornelius's junior right farther down the line, and that they were denied the ability to mount a defense because the Board's application of the 2003 definition of "municipal water supply purposes" meant evidence they submitted of relinquishment was entirely disregarded.

Appellants have shown that the Board's application of the 2003 legislation violated due process. Unlike the facial challenge in *Lummi*, 170 Wn.2d at 267, here appellants establish that individual right holder Scott Cornelius's reasonable expectation of enjoyment of his water rights is impaired in violation of due process by the Board's application of the 2003 legislation, which effectively bars consideration of his evidence showing relinquishment prior to 2003. Due process requires that in the consideration of

---

[18] Significantly, it is undisputed that the Grand Ronde Aquifer, from which individual plaintiff Cornelius and WSU obtain their water, is being pumped at a rate greater than the recharge rate. The Board determined, as all parties agree, that declining water levels in the aquifer threaten all of the users in the basin. Aquifer levels have declined an average 100 feet since measurements began in the 1930's. Individual appellant Scott Cornelius has documented a drop of 12.5 feet over 15 years in his private, domestic well.

The Board's 2008 final order stated that "[t]he extent and availability of groundwater resources in the GRA [Grande Ronde Aquifer] are poorly known, due in part to a lack of precise information about the aquifer's rate of recharge. It is therefore impossible to predict with any degree of certainty how long the water in the GRA will last." Findings of Fact, Conclusions of Law & Order, No. 06-099, at 19-22 (Pollution Control Hr'gs Bd. Apr. 17, 2008) (4 AR Doc. 89). Pumping water in the area exceeds the aquifer's recharge and increases in the aggregate pumping in the Pullman-Moscow region "will necessarily cause water-level declines within the aquifer." *Id.* at 21.

21

amendments to groundwater rights under RCW 90.44.100, historic nonuse of rights issued for domestic and community domestic and stock water uses must be evaluated and the water rights be relinquished in whole or part when appropriate under the statutes. *See id.* at 270-71 (citing *R.D. Merrill*, 137 Wn.2d at 127; RCW 90.44.100).[19]

I disagree with the majority's view that to reach this conclusion would require us to overrule *Lummi* and invalidate RCW 90.03.560. Majority at 13-14. Both contentions are incorrect. In *Lummi*, we acknowledged that the 2003 amendments applied to and confirmed "existing" water rights and that the amendments did *not* resurrect any relinquished rights. 170 Wn.2d at 263, 264, 268. Similarly, RCW 90.03.560 clearly applies to *existing* rights, that is, rights that have *not* been relinquished.[20]

Further, the majority says that this case demonstrates the "labeling problem" that RCW 90.03.560 was meant to address. Majority at 15. The majority reasons that in 1962

---

[19] I again disagree with the majority's view that "[i]f we ruled for Cornelius, Ecology would regularly violate a junior water right holder's due process rights when it applied RCW 90.03.560 to amend a senior municipal holder's water right, the precise argument we rejected in *Lummi Indian Nation*." Majority at 17. As noted, *Lummi* rejected only a facial challenge and left the door open for the as applied challenge presented here. Moreover, as discussed above, RCW 90.03.560 may be applied to relabel *existing* rights, that is, water rights that have been fully utilized, put to beneficial use, and thus have not been statutorily relinquished.

[20] RCW 90.03.560 provides as follows:

When requested by a municipal water supplier or when processing a change or amendment to the right, the department shall amend the water right documents and related records to ensure that water rights that are for municipal water supply purposes, as defined in RCW 90.03.015, are correctly identified as being for municipal water supply purposes. This section authorizes a water right or portion of a water right held or acquired by a municipal water supplier that is for municipal water supply purposes as defined in RCW 90.03.015 to be identified as being a water right for municipal water supply purposes. However, it does not authorize any other water right or other portion of a right held or acquired by a municipal water supplier to be so identified without the approval of a change or transfer of the right or portion of the right for such a purpose.

22

and 1963 Ecology had no reason to be precise about distinguishing between municipal and domestic uses, stating that "Ecology could have issued domestic supply certificates to entities that were functionally municipal and vice versa." *Id.*

I disagree. As discussed at length above, the distinction between domestic use and municipal use is a long-standing fixture of water law in the west. Under the statutory scheme, designated water rights may not be so easily disregarded. Although the 2003 amendments resolved a particular labeling problem regarding *existing* water rights utilized for municipal purposes, that circumstance is not present here. As we have explained, if a user has met application requirements under RCW 90.03.290, Ecology will issue a water rights permit "'stating the amount of water to which the applicant shall be entitled and the beneficial use or uses to which it may be applied.'" *Theodoratus*, 135 Wn.2d at 591 (quoting RCW 90.03.290(3)). Thereafter, a "final certificate of water right will be issued upon a showing that the appropriation has been perfected." *Id.* at 592. In *Theodoratus*, we held that "a water right must be based on actual application of water to beneficial use and not upon system capacity." *Id.* "'An appropriated water right is established and maintained by the purposeful application of a given quantity of water to a beneficial use upon the land.'" *Id.* (quoting *Dep't of Ecology v. Grimes*, 121 Wn.2d 459, 468, 852 P.2d 1044 (1993) (emphasis omitted) (quoting *Neubert v. Yakima-Tieton Irrig. Dist.*, 117 Wn.2d 232, 237, 814 P.2d 199 (1991))). "Perfection of an appropriative right requires that appropriation is complete only when the water is actually applied to a beneficial use." *Id.* (emphasis omitted). "In requiring actual application of water to

23

No. 88317-3
Madsen, C.J., dissenting

beneficial use in order to perfect an appropriative right before a final certificate of water right may be issued, the statutes codify fundamental western water law." *Id.* "[B]eneficial use must be calculated based upon diversion and actual use under this state's law." *Id.* at 593; *Acquavella*, 131 Wn.2d at 756.

More to the point, as we have repeatedly held, "[w]ater rights may be relinquished." *Theodoratus*, 135 Wn.2d at 594-95 (citing RCW 90.14.130-.180); *see also Lummi*, 170 Wn.2d at 251-52. "The failure 'to beneficially use all or any part' of the right for five years, without sufficient cause, 'shall relinquish' the right in whole or in part." *Theodoratus*, 135 Wn.2d at 595 (quoting RCW 90.14.160, .170, .180); *see also Lummi*, 170 Wn.2d at 251-52. "We will not construe the statutory scheme in a way which renders [the] provisions of the relinquishment statutes meaningless." *Theodoratus*, 135 Wn.2d at 595. Yet that is precisely what the majority has done. The majority purports to apply *Lummi*, but as noted we recognized there that the 2003 amendments do not resurrect relinquished rights. 170 Wn.2d at 268.

The fact that the legislature waited until 2003 to formally define "municipal water supply purposes" does not alter the fact that the water right designation for *domestic* use appearing in the 1962 and 1963 certificates did not include municipal use, such domestic use was subject to relinquishment, and was so relinquished due to nonuse long before the 2003 amendments issued. "Under RCW 90.14.180, a person who holds a water right and who voluntarily fails, without sufficient cause, to beneficially use all or a portion of the right for five successive years *will relinquish all or a portion of the right*." *Pac. Land*

24

*Partners, LLC v. Dep't of Ecology,* 150 Wn. App. 740, 749-50, 208 P.3d 586 (emphasis added) (citing *R.D. Merrill,* 137 Wn.2d at 139; *Motley–Motley, Inc. v. Pollution Control Hr'gs Bd.,* 127 Wn. App. 62, 75, 110 P.3d 812 (2005)), *review denied,* 167 Wn.2d 1007 (2009). Such relinquished right "shall revert to the state." RCW 90.14.180; *see also Pub. Util. Dist. No. 1 of Pend Oreille County v. Dep't of Ecology,* 146 Wn.2d 778, 798, 51 P.3d 744 (2002) ("Statutory forfeiture [under RCW 90.14.130-.180] does not require intent to abandon.").[21]

In my view, this court must remand the question of the extent to which WSU relinquished water rights under Certificates 5070-A and 5072-A. The relinquished portions of these rights cannot be recharacterized as rights for municipal uses; to do so under the circumstances violates due process. To the extent these rights have been relinquished, they are not eligible for amendment.

## Conclusion

Water rights granted in the 1960's for domestic uses was not a water right granted for municipal use. Accordingly, the exception to statutory relinquishment that exists for

---

[21] This result does not render RCW 90.03.560 superfluous, as the majority contends. The statute may be properly applied to the appropriate circumstances. For instance, had WSU fully utilized the water allocated under Certificates 5070-A and 5072-A since the mid-1960s without lapse and broadened the use of such water to include municipal uses, then there would be no relinquishment and WSU's change application could be properly processed under RCW 90.03.560. But that is not the circumstance here, and RCW 90.03.560 is not applicable under the facts of this case. *Cf. Pub. Utility Dist. No. 1,* 146 Wn.2d at 798 ("[I]n order to determine whether a change application may be granted under RCW 90.03.380, Ecology must tentatively quantify the right in order to determine whether the right qualifies for a change. If the right has been extinguished through relinquishment or abandonment, it is not subject to a certificate of change." (citation omitted)).

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

Madsen, C.J., dissenting

municipal water rights did not apply to these rights during the period of time that appellants assert they were lost for nonuse. The rights that WSU held for domestic uses were subject to statutory relinquishment.

The appellants have submitted sufficient evidence to show nonuse, in whole or in part, of groundwater rights under Certificates 5070-A and 5072-A, and as we noted in *Lummi*, the 2003 amendments do not resurrect relinquished rights. 170 Wn.2d at 268.

Here, appellants have established a due process violation because vested rights were impaired by the Board's application of the 2003 legislation governing municipal water uses to WSU's water rights, which were issued for domestic uses and community domestic and stock water uses and had long since been subject to relinquishment due to nonuse.

This court should reverse the Board's determination that the water rights under Certificates 5070-A and 5072-A were not relinquished in whole or in part and remand for a determination of the extent to which these rights were relinquished.

I dissent.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 88317-3

Madsen, C.J.,dissenting

Madsen, C.J.

Wiggins, J.

Gordon McCloud, J.