IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| SILVIA ZARATE, | ) | |
| | ) | No. 40835-3-III |
| Appellate, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| STATE OF WASHINGTON PUBLIC | ) | UNPUBLISHED OPINION |
| EMPLOYMENT RELATIONS | ) | |
| COMMISSION, | ) | |
| | ) | |
| Respondent. | ) | |

COONEY, A.C.J. — Silvia Zarate was a licensed foster parent and employed as a social services specialist for the Department of Children, Youth, and Families (DCYF). In 2020, Child Protective Services (CPS) investigated allegations of physical abuse and neglect of a foster child in Ms. Zarate's home. The investigation concluded with a founded finding of physical abuse and neglect (founded finding) against Ms. Zarate. She was also criminally charged with assault of a child in the second degree. Both the founded finding and pending criminal charge disqualified Ms. Zarate from serving as a social service specialist. As a result, the DCYF placed Ms. Zarate on alternate

assignment. While on alternate assignment, an investigation into another DCYF employee revealed that Ms. Zarate had been misusing her employee credentials to access her own and other foster parents' licensing files in the DCYF's child welfare database. Ms. Zarate's employment with the DCYF was later terminated.

Ms. Zarate filed an unfair labor practice complaint with the Public Employment Relations Commission (PERC) alleging her termination was due to union animus. A hearing examiner later found Ms. Zarate had established a prima facie case of discrimination but that the DCYF articulated a legitimate, nondiscriminatory reason for her termination. The hearing examiner concluded that Ms. Zarate's termination was not pretextual and that the DCYF did not commit an unfair labor practice. Ms. Zarate appealed the hearing examiner's decision to the PERC and then to the superior court. Both affirmed the hearing examiner's decision.

On appeal to this court, Ms. Zarate argues the PERC misapplied the law to the facts, and its order is not supported by substantial evidence. She further contends the PERC erred in not addressing her due process claim and, arguing the merits, that it is another independent basis on which this court could reverse. We disagree with Ms. Zarate's arguments and affirm.

## BACKGROUND

Ms. Zarate began working for the State of Washington as a Child Welfare Worker in 2008 and transitioned to working for the DCYF as a Social Service Specialist 3 in

2018. Social Service Specialist 3 is a "covered position," meaning Ms. Zarate had to comply with the DCYF's background check policy because the job required her to have unsupervised contact with children. Clerk's Papers (CP) at 462. If certain "crimes [or] negative actions" appeared on an employee's background check, including a founded finding of child abuse, an employee in a covered position was disqualified from performing their job. Part of the DCYF's background check policy states the "[DCYF] must not deny employment based on information in the criminal history record until the applicant has been afforded a reasonable time to correct or complete the record, or has declined to do so." CP at 2136.

In both of her positions at DCYF, Ms. Zarate's "main job was to ensure child safety and do family assessment, conduct monthly home visits, case notes, and case management services." CP at 346. Her job also required her to "help the parents with parental deficiencies to be able to keep their children with them." CP at 346.

Ms. Zarate was also a union member and had previously sought her union's protection. In 2017, Ms. Zarate filed a union grievance against her then supervisor, Jennifer Martin. Ms. Zarate asked Phaedra Quincey, her union representative at the time, to prevent Dorene Perez, a supervisor of Ms. Zarate's, from overseeing the grievance due to concerns of fairness. Ms. Zarate was not satisfied with the way Ms. Quincey handled her grievance.

In addition to her employment with the DCYF, Ms. Zarate was a licensed foster parent. Licensed foster parents are subject to licensing laws and regulations enforced by the DCYF licensing department of CPS. The DCYF licensing department of CPS is a separate entity from the child welfare field operations office where Ms. Zarate worked.

In early 2020, the child welfare field operations office where Ms. Zarate worked was informed that the DCYF licensing department had "received a report of child abuse and neglect where [Ms. Zarate] was the subject of a physical abuse allegation." CP at 913. The allegations stemmed from an incident in which a foster child in Ms. Zarate's care accused Ms. Zarate of choking her. As a result of the accusation, Ms. Perez, now the regional administrator and appointing authority for Ms. Zarate's child welfare field operations office, placed Ms. Zarate on alternate assignment. The alternate assignment permitted Ms. Zarate to perform a job that did not require unsupervised contact with children. Ms. Zarate had concerns about the way CPS handled the investigation into her alleged abuse and removing the children from her home. She contacted the Washington State Office of the Family and Children's Ombuds to report her concerns.

While Ms. Zarate was on alternate assignment, an investigation into another DCYF employee, Maribel Rivera, revealed that Ms. Zarate had been misusing her employee credentials to access her own and other foster parents' licensing files on FamLink, the DCYF's child welfare database. Ms. Rivera was a foster parent and Ms. Zarate's coworker and close friend. When Ms. Perez learned of this misconduct, she

4

requested an audit of FamLink. The audit revealed that Ms. Zarate had repeatedly accessed restricted foster parent licensing files without a business need for "about two-and-a-half years." CP at 517. Specifically, the audit showed Ms. Zarate accessed her own foster parent file and CPS intakes 188 times and accessed Ms. Rivera's foster parent information over 100 times.

In July 2020, Ms. Perez was notified that the investigation into Ms. Zarate's alleged physical abuse and neglect of a foster child concluded in a founded finding and that she had been charged with assault of a child in the second degree. Also in July, Ms. Zarate filed a complaint with the State Auditor regarding "conflict of interest concerns" with Ms. Perez. CP at 371. Ms. Perez referred the allegations of Ms. Zarate's misuse of FamLink and the founded finding to the workplace investigations unit. The investigation into Ms. Zarate was assigned to Stephanie Frost. Ms. Zarate was on approved leave from mid-April through August 2020. Consistent with the DCYF's policy, the investigation was postponed until Ms. Zarate returned to work. Ms. Zarate was provided notice of the administrative investigation when she returned to work on August 19, 2020.

Ms. Frost interviewed Ms. Zarate about her alleged workplace misconduct after Ms. Zarate returned to work. During the interview, Ms. Zarate admitted to using her employee credentials to view her own licensing records and CPS intakes, as well as Ms. Rivera's, without a business need, and acknowledged her conduct violated confidentiality

and DCYF policy. Ms. Zarate admitted guilt and took responsibility for her actions. The administrative investigative report was completed in October 2020.

Ms. Perez reviewed the report and issued a notice of intent to discipline letter to Ms. Zarate alleging that: (1) Ms. Zarate "accessed restricted information in FamLink regarding [her] coworker, Maribel Rivera's, foster parent provider profile and CPS intake;" (2) Ms. Zarate "accessed restricted information in FamLink regarding [her] own foster parent provider profile and CPS intakes from 2016 and 2020;" and (3) a CPS "investigation resulted in Founded findings of physical abuse of [her] foster child." CP at 1496-97. A predisciplinary meeting was later held and attended by Ms. Perez, Ms. Quincey (now a human resource field operations manager for the DCYF), Megan O'Neil (a senior human resources consultant), Ms. Zarate, and Ms. Zarate's attorney. Ms. Zarate was given the opportunity to "share additional information" and "additional documentation" at the meeting. CP at 939. Ms. Zarate "tried the best that [she] could to explain [her] situation, what [she] was doing to correct [her] founded [finding] and criminal charge" and "was very apologetic about the computer violations." CP at 409. She also reiterated "a concern" about Ms. Quincey "being part of [her] investigation." CP at 409.

Following the meeting, Ms. Zarate provided two letters to Ms. Perez, one on November 17, 2020, and the second on November 30, 2020. Ms. Zarate later testified that the letters informed the DCYF of her intent to file a union grievance. The first letter

6

did not mention Ms. Zarate's union or use the word "grievance." CP at 1506-07. The second letter stated Ms. Zarate had "joined Maribel Rivera's grievance." CP at 1521.

Ms. Perez determined that termination of Ms. Zarate's employment was the appropriate level of discipline based on the founded finding and Ms. Zarate's misuse of FamLink. Dayana Sanchez, Ms. Perez's assistant, worked on finalizing the notice of discharge and sent it by e-mail to Ms. Perez on December 14, 2020. Ms. Perez, Ms. Sanchez, and Ms. O'Neil exchanged e-mails regarding edits to the notice of discharge and how it would be delivered to Ms. Zarate. Ms. Sanchez offered to send the notice of discharge to the employee who would handdeliver the letter to Ms. Zarate. Ms. Perez responded by e-mail to Ms. Sanchez's offer, writing that she "already did 😊." CP at 1623.

On December 14, 2020, Ms. Zarate received the notice of discharge informing her that she was discharged from employment with the DCYF. The "Basis for Discipline" listed three charges that largely mirrored the allegations listed on her notice of intent to discipline letter. CP at 2039-40 (emphasis omitted); *see also* CP at 1496-98. Ms. Zarate's criminal charge was dismissed without prejudice in April 2021, and the founded finding was overturned in June 2021.

Following her termination, Ms. Zarate filed an unfair labor practice complaint with the PERC. A three-day hearing was later held before a hearing examiner.

Witnesses called to testify at the hearing included Ms. Perez, Ms. Zarate, and Renate Rhodes, the DCYF workplace investigations administrator, among others.

Ms. Rhodes testified she was involved in the "writing of DCYF policies" including the background check policy. CP at 475. She testified that the policy stated the DCYF must not deny employment based on information in a criminal history background check until the employee has been afforded a reasonable time to view their record and fix any "errors on the[ir] rap sheet." CP at 491. Ms. Rhodes clarified, "[W]e have to give the employee or prospective employee an opportunity to contact Washington State Patrol [for example,] and say, 'Hey, there's a crime on my rap sheet. I didn't commit it and here's proof.'" CP at 492. Ms. Rhodes also testified that a pending criminal charge and a CPS founded finding disqualified Ms. Zarate from employment as a Social Service Specialist 3 because "she can't have unsupervised or direct client access, which is an essential part of her job." CP at 475.

Ms. Perez testified that she uses happy face emojis in e-mails as "part of polite communication." CP at 989. Ms. Perez stated she believed Ms. Zarate's misuse of FamLink was "egregious" because "[i]t was such sensitive information, and it compromised the [CPS] investigation . . . and it significantly compromised [DCYF's] reputation and the public trust about [Ms. Zarate] being able to do this." CP at 519. Ms. Perez testified, "The fact that it just had continued on for so long, it was just—it was rather shocking." CP at 519. Ms. Perez also claimed she did not have "animus against

8

the union." CP at 522. Ms. Perez testified about other DCYF employees who had been terminated for similar misconduct. She stated Ms. Rivera was terminated for similar "FamLink confidentiality violations" as well as misuse of a state-issued phone. CP at 531. Another employee, Esmeralda Correa-Martinez, was also terminated for FamLink misuse and confidentiality violations.

Ms. Perez testified that she believed the "facts supported a finding that [Ms. Zarate] had abused a child in her care." CP at 955. She testified Ms. Zarate was terminated, in part, due to the "abuse and neglect of a child." CP at 993. When asked whether she was referring to the "founded finding of it or the actual fact of it," Ms. Perez responded, "The fact of it." CP at 993. Ms. Perez later testified that Ms. Zarate was fired, in part, because the founded finding meant "[s]he was no longer qualified for a position." CP at 539. When asked again if she believed "Ms. Zarate had engaged in abuse of her foster child," Ms. Perez responded, "The facts that I considered was [that] there was a finding of abuse and neglect that was made by the licensing division. That finding made her not be in compliance with the background check policy. She was no longer qualified for the position." CP at 540. Ms. Perez made it clear that Ms. Zarate was also terminated for misusing FamLink.

The hearing examiner later issued his "Findings of Fact, Conclusions of Law, and Order." CP at 212. In it, the hearing examiner found (1) Ms. Zarate had made a prima facie case of discrimination, (2) the DCYF articulated a legitimate, nondiscriminatory

9

reason for Ms. Zarate's termination, and (3) that Ms. Zarate's termination was not pretextual. Thus, the hearing examiner concluded the DCYF did not commit an unfair labor practice.

Ms. Zarate appealed the hearing examiner's decision to the PERC. The PERC affirmed the hearing examiner's decision and adopted his findings and conclusions as its own. Ms. Zarate appealed the PERC's decision to the superior court which affirmed the PERC.

Ms. Zarate now appeals to this court.

## ANALYSIS

WHETHER THE HEARING EXAMINER ERRED IN CONCLUDING THE DCYF'S
REASONS FOR TERMINATING MS. ZARATE WERE NOT PRETEXTUAL

Ms. Zarate argues the PERC's decision is not supported by substantial evidence and that it misapplied or misinterpreted the law in reaching its decision. RCW 34.05.570(3)(d), (3)(e). We disagree.

"Chapter 41.56 RCW prohibits public employers from interfering with or discriminating against the exercise of the rights secured by the collective bargaining statute." *Int'l Ass'n of EMTs and Paramedics v. Grant County Public Hosp. Dist. 1*, No. 13514-U-97-3300, 1999 WL 1338343, at 2, (Wash. Pub. Emp't Relations Comm'n Dec. 14, 1999); *see* RCW 41.56.040. "Washington adjudicates statutory discrimination claims using the *McDonnell Douglas Corporation v. Green*[, 411 U.S. 792, 93 S. Ct. 1817,

36 L. Ed. 2d 668 (1973),] framework." *City of Vancouver v. State Pub. Employ. Relations Comm'n*, 180 Wn. App. 333, 348, 325 P.3d 213 (2014). The complaining party, here, Ms. Zarate, first bears the burden of establishing a prima facie case of discrimination. *Wilmot v. Kaiser Aluminum & Chem. Corp.*, 118 Wn.2d 46, 67-69, 821 P.2d 18 (1991).

In the context of an unfair labor practices claim, a prima facie case requires the plaintiff to show "'(1) the employee has participated in protected activity or communicated to the employer an intent to do so; (2) the employee has been deprived of some ascertainable right, benefit or status; and (3) there is a causal connection between those events.'" *Yakima Police Patrolmen's Ass'n v. City of Yakima*, 153 Wn. App. 541, 554, 222 P.3d 1217 (2009) (quoting *Pub. Sch. Emps. of Reardan-Edwall v. Reardan-Edwall Sch. Dist.*, No. 12593-U-96-2997, 1998 WL 1056978, at *6 (Wash. Pub. Emp't Relations Comm'n Sept 29, 1998)). If the complaining party established a prima facie case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Wilmot*, 118 Wn.2d at 70; *Pub. Sch. Emps. of Reardan-Edwall*, 1998 WL 1056978, at *6. "The employer bears the burden of production, not of persuasion, in offering this permissible reason for the adverse employment decision." *City of Vancouver*, 180 Wn. App. at 349.

If the employer meets its burden of offering a permissible justification for the adverse employment action, the complaining party bears the burden of persuasion in showing the employee's exercise of protected rights under chapter 41.56 RCW triggered

11

the adverse employment action. *Wilmot*, 118 Wn.2d at 70; *Yakima Police Patrolmen's Ass'n*, 153 Wn. App. at 554. The complaining party may meet their burden in two ways: (1) by showing the employer's stated reason for the adverse employment action was pretextual or (2) by showing that, although the employer's stated reason is legitimate, animus towards the employee's protected union activity was "a substantial motivating factor" for the employer's action. *Yakima Police Patrolmen's Ass'n*, 153 Wn. App. at 554.

This court reviews the PERC's decision in an unfair labor practice case according to the Administrative Procedure Act (APA), chapter 34.05 RCW, standards. *Pasco Police Officers' Ass'n v. City of Pasco*, 132 Wn.2d 450, 458, 938 P.2d 827 (1997). We sit in the same position as the superior court and apply the standards of RCW 34.05.570 directly to the agency record. *Postema v. Pollution Control Hr'gs Bd.*, 142 Wn.2d 68, 77, 11 P.3d 726 (2000).

RCW 34.05.570 provides, in relevant part:

> (3) Review of agency orders in adjudicative proceedings. The court shall grant relief from an agency order in an adjudicative proceeding only if it determines that:
> . . . .
>
> (d) The agency has erroneously interpreted or applied the law;
>
> (e) The order is not supported by evidence that is substantial when viewed in light of the whole record before the court, which includes the agency record for judicial review, supplemented by any additional evidence received by the court under this chapter;

12

Ms. Zarate asserts the PERC's order erroneously interpreted and applied the law and is not supported by substantial evidence. RCW 34.05.570(3)(d), (3)(e).

Under RCW 34.05.570(3)(d), we review de novo whether the agency decision contains a legal error. *Kittitas County v. E. Wash. Growth Mgmt. Hr'gs Bd.*, 172 Wn.2d 144, 155, 256 P.3d 1193 (2011). "[W]e give the agency's interpretation of the law great weight where the statute is within the agency's special expertise." *Cornelius v. Dep't of Ecology*, 182 Wn.2d 574, 585, 344 P.3d 199 (2015).

For challenges pursuant to RCW 34.05.570(3)(e), we review findings of fact to determine whether there is "'a sufficient quantity of evidence to persuade a fair-minded person of the truth or correctness of the order.'" *City of Redmond v. Cent. Puget Sound Growth Mgmt. Hr'gs Bd.*, 136 Wn.2d 38, 46, 959 P.2d 1091 (1998) (quoting *Callecod v. Wash. State Patrol*, 84 Wn. App. 663, 673, 929 P.2d 510 (1997)). We review the evidence in the light most favorable to "'the party who prevailed in the highest forum that exercised fact-finding authority.'" *City of Univ. Place v. McGuire*, 144 Wn.2d 640, 652, 30 P.3d 453 (2001) (quoting *State ex rel. Lige & Wm. B. Dickson Co. v. County of Pierce*, 65 Wn. App. 614, 618, 829 P.2d 217 (1992)). "The APA's directive that we review whether an order is supported 'by evidence that is substantial when viewed in light of the *whole record* before the court' requires us to look beyond whether there is merely some evidence that supports the agency order." *Crosswhite v. Dep't of Soc. & Health Servs.*, 197 Wn. App. 539, 548, 389 P.3d 731 (2017) (quoting RCW

34.05.570(3)(e)). We defer to the review judge's determinations of witness credibility and weight given to the evidence. *Spokane County v. E. Wash. Growth Mgmt. Hr'gs Bd.*, 176 Wn. App. 555, 565, 309 P.3d 673 (2013).

Ms. Zarate contends she met her burden of demonstrating the DCYF's reasons for termination were pretextual (union animus) and therefore the PERC's findings to the contrary are not supported by substantial evidence. She further contends the PERC misapplied the law to the facts of the case. Specifically, Ms. Zarate challenges findings of fact 10, 14, 16, 17, 18, 19, 20, 23, 26, and 27 as well as conclusion of law 2.

*Substantial Evidence*

Ms. Zarate assigns error to numerous findings of fact, but she does not explain how many of them are not supported by substantial evidence. Instead, Ms. Zarate's brief is largely devoted to explaining how the PERC should have come to a different conclusion based on the evidence before it. However, "[w]e do not reweigh evidence or judge witness credibility, but instead defer to the agency's broad discretion in weighing the evidence." *Whidbey Env't Action Network v. Growth Mgmt. Hrg's Bd.*, 14 Wn. App. 2d 514, 526, 471 P.3d 960 (2020). Our review is limited to whether the challenged findings are supported by substantial evidence. We conclude the findings are supported by substantial evidence.

Challenged findings of fact 10 and 14 state:

10. The Child Protective Services investigation resulted in what is referred to as a "founded finding" against Zarate. A founded finding "means that [Child Protective Services] investigated the allegation(s) and, based on the information available, has determined that it was more likely than not that the abuse and/or neglect occurred and you [Zarate] are the person responsible for the abuse and/or neglect."

. . . .

14. At the time Zarate's employment was terminated by DCYF on December 14, 2020, both the founded finding and criminal charges were standing.

CP at 33. Both of these findings are supported by substantial evidence. Ms. Zarate

seems to take exception to these findings because the founded finding was eventually

overturned. However, there is no dispute that Ms. Zarate had a founded finding against

her at the time of her termination in December 2020.

Findings of fact 16, 17, 18, and 19 read:

16. In Spring of 2020, while conducting a separate workplace investigation, DCYF discovered that Zarate had used her database credentials to gain unauthorized access to confidential Child Protective Services foster parent information that was unrelated to her work in Child Welfare. An investigation showed that she accessed a friend and coworker's foster parent profile four times without a business need and accessed that same coworker's Child Protective Services case file 100 times without a business need. She had also accessed her own foster parent profile 164 times and her own Child Protective Services case files 24 times without a business need. This included a period of time when Zarate was under Child Protective Services investigation for the foster child abuse allegations and ceased only when Zarate's database access ended when she was placed on alternative assignment.

17. The information Zarate accessed was at least in part related to the Child Protective Services investigation into the child abuse allegations against her

15

and could have given her inside information regarding the status of the investigation and allegations.

18. On July 31, 2020, Perez opened a workplace investigation into both the founded finding and the unauthorized database access. Workplace investigations are processed through a separate DCYF division from both Child Protective Services and Child Welfare. An investigator was assigned and issued an investigation report on October 14, 2020, that substantiated the allegations.

19. On November 2, 2020, Perez issued a notice of intent to discipline letter to Zarate. The letter included references to the two aspects of the unauthorized database access (regarding accessing her own records and for accessing those of her friend) and for the founded finding and criminal charge related to the child abuse allegations as potential reasons for taking disciplinary action.

CP at 33-34. Ms. Zarate suggests that these findings fail to establish a nonpretextual reason for the adverse employment action, but we are not tasked with reweighing the evidence on appeal. Regardless, these challenged findings reiterate undisputed facts and are supported. An audit of FamLink revealed Ms. Zarate accessed restricted records without a business purpose or authorization. The records Ms. Zarate accessed included her own "foster parent provider file" and her "CPS investigative file." CP at 507. The ensuing investigation substantiated the allegations, and Ms. Zarate was issued a notice of intent to discipline letter stating the charges against her, including the unauthorized database access, the founded finding, and the pending criminal charge. Findings of fact 16, 17, 18, and 19 are supported by substantial evidence in the record.

Challenged findings 20 and 23 state:

20. A predisciplinary meeting was held November 12, 2020. During that meeting, Zarate admitted to and accepted responsibility for the unauthorized database access. However, she vigorously denied the child abuse allegations underlying the founded finding and criminal charges. She told Perez and Quincey that she was challenging the allegations and they would be overturned. She also expressed concern over Quincey's role since she had formerly been her union representative.

. . . .

23. On December 14, 2020, Zarate's employment was terminated. In the final notice of discharge letter, Perez cited the same conduct as in the November 2, 2020, notice of intent to discipline letter as the reasons for terminating Zarate's employment. They included the two aspects of unauthorized database access and the founded finding and criminal charges related to the child abuse allegations that were still standing at the time. However, she added the following: "your off duty conduct which resulted in the founded finding and criminal charge, is detrimental to your work performance or the program of the agency."

CP at 34-35. As to finding of fact 20, Ms. Zarate admitted to and accepted responsibility for her unauthorized access of the FamLink database and reiterated her intention to clear her name of the child abuse charges at the November 12, 2020, predisciplinary meeting. Ms. Zarate also testified that she repeated a concern she had about Ms. Quincey being a part of the investigation. Finding of fact 20 is supported by substantial evidence.

Turning to finding of fact 23, Ms. Zarate argues that Ms. Perez included "items" in her termination letter that were not disclosed to Ms. Zarate at the outset of the investigation, specifically "RCW 43.216.170, the Secretary's List, and [Collective Bargaining Agreement] Article 28.3." Br. of Appellant at 39. Ms. Zarate characterizes these "items" as new "justifications" and "bases for which DCYF never investigated."

Br. of Appellant at 21, 39. However, the notice of discharge letter did not cite new bases or justifications for Ms. Zarate's termination. The charges and allegations against Ms. Zarate remained the same but the notice of discharge letter included a few new citations to policies that were "implicated" by Ms. Zarate's conduct. *Compare* CP at 1498 *with* CP at 2041 (emphasis and some capitalization omitted). Thus, finding 23 is supported by substantial evidence.

Finally, findings 26 and 27 read:

26. DCYF terminated Zarate's employment because she violated policy by accessing her friend and coworker's foster parent record and Child Protective Services case information in DCYF's database without a business need, by accessing her own foster parent record and Child Protective Services case information in the DCYF database without a business need, and that she had a founded finding of child abuse and neglect and a related criminal charge pending at the time her employment was terminated that disqualified her from doing her job.

27. The reasons DCYF cited for terminating Zarate's employment were not pretextual, nor substantially motivated by union animus.

CP at 35-36. Relatedly, Ms. Zarate challenges conclusion of law 2:

2. By terminating Silvia Zarate's employment as described in findings of fact 4 through 27, Washington State Department of Children, Youth, and Families did not discriminate against Zarate or violate RCW 41.80.110(1)(c).

CP at 36. Ms. Zarate challenges findings 26 and 27 and conclusion of law 2 because she disagrees with the PERC's findings and conclusion that her termination was not pretextual but was instead due to her misconduct and the founded finding that prohibited

18

her from doing her job. Substantial evidence in the record supports the PERC's findings, and we will not reweigh the evidence to come to a different conclusion. The founded finding disqualified Ms. Zarate from her job. Moreover, there is no dispute that Ms. Zarate's unauthorized FamLink access was a violation of DCYF policy and a serious confidentiality breach. Thus, substantial evidence supports finding of fact 26. Finding 27 is also supported because a sufficient quantity of evidence exists in the record to persuade a fair-minded person of the correctness of the PERC's decision. Finally, the supported findings, in turn, support the conclusion that the DCYF did not discriminate against Ms. Zarate in violation of RCW 41.80.110(1)(c) when it terminated her.

In sum, the findings and conclusions Ms. Zarate challenges are supported by substantial evidence in the record.

### Misapplication of the Law

Ms. Zarate argues the PERC incorrectly determined her termination was not pretextual. She contends the PERC and the hearing examiner "misunderstood the standards for evaluating pretext" and the "findings and conclusions that PERC adopted as its own misapplied the correct legal standard." Br. of Appellant at 41. Nevertheless, Ms. Zarate does not explain how the PERC misapplied or misunderstood the law. Generally, Ms. Zarate argues she was actually fired due to union animus evidenced by (1) the DCYF's explanations for her termination shifting over time, (2) the suspect timing of her termination, (3) the DCYF's unwillingness to allow her time to appeal the founded

finding, (4) the severity of her punishment being harsher than punishment for other

employees accused of similar misconduct, (5) the exaggeration of her misconduct by the

DCYF, and (6) the use of a smiley face emoji by Ms. Perez in an e-mail thread containing

her notice of discharge letter. Though these arguments boil down to a disagreement with

the weight of the evidence, which is not an APA standard of review, we address Ms.

Zarate's arguments.

First, the DCYF's explanations for Ms. Zarate's termination remained consistent.

Though the DCYF cited additional implicated policies in its notice of discharge, Ms.

Zarate's underlying charges remained the same. Ms. Zarate claims the hearing examiner

found Ms. Perez's testimony to be "not reliable." CP at 30. Her argument misrepresents

the PERC's findings. The hearing examiner wrote:

> Zarate also points to Perez' inconsistent testimony about whether it was the
> existence of the founded finding that formed the basis for the decision to
> terminate Zarate's employment, or whether Perez actually believed the
> underlying allegations of child abuse. . . .
>
> Perez' testimony is not reliable on this point in that she went back-and-forth
> in her testimony regarding whether she based her decision on the existence
> of the founded finding and criminal charges, or whether she believed the
> underlying accusations of child abuse were in fact true. . . .
>
> However, in the end it does not make a difference to the outcome [because]
> . . . [e]ven if Perez did believe that the underlying accusations of the
> founded finding and criminal charges were true and that belief formed part
> of her decision, that motivation does not demonstrate that she acted out of
> union animus.

CP at 30.  The PERC did not find Ms. Perez's testimony about why Ms. Zarate was terminated unreliable.  Instead, it found Ms. Perez did not testify consistently about whether she believed the accusations underlying the founded finding.  As the PERC pointed out, whether Ms. Perez believed the accusations or not was irrelevant to whether Ms. Zarate's termination was due to union animus.

Second, the timing of Ms. Zarate's termination does not suggest pretext given the surrounding circumstances.  Though Ms. Zarate was terminated 14 days after submitting a letter indicating she would be joining Ms. Rivera's grievance, both letters were sent after the November 12, 2020, predisciplinary meeting.  At the time the second letter was sent, Ms. Zarate was already aware that she was going to be disciplined for her unauthorized FamLink access and that she was disqualified from her job due to the founded finding.  Her termination 14 days after engaging in protected union activity does not demonstrate a causal connection given that the disciplinary process was well underway when she sent the November letters.

Third, Ms. Zarate misinterprets the DCYF policy she alleges should have allowed her time to appeal the founded finding of abuse.  The DCYF's background check policy states, "[DCYF] <u>must</u> not deny employment based on information in the criminal history record until the applicant has been afforded a reasonable time to correct or complete the record, or has declined to do so."  CP at 2136.  Ms. Rhodes testified that the policy is designed to allow an applicant or employee time to correct "errors" on a background

check. CP at 491. Ms. Rhodes stated, "[W]e have to give the employee or prospective

employee an opportunity to contact Washington State Patrol [for example,] and say,

'Hey, there's a crime on my rap sheet. I didn't commit it and here's proof.'" CP at 492.

Thus, Ms. Zarate's contention that the DCYF violated its own policy by not allowing her

time to appeal the founded finding and clear her name fails. At the time of her

termination, her background check correctly reflected a founded finding and a pending

criminal charge.

Fourth, Ms. Zarate argues she was punished more severely than other employees

who committed similar misconduct, evidencing pretext. As the DCYF points out, Ms.

Zarate was disciplined in a manner consistent with others who committed similar

offenses. Notably, Ms. Zarate's conduct was not a one-time mistake. Rather, it was

intentionally committed over a period of years. Furthermore, evidence in the record

showed other employees who committed similar violations were also terminated.[1] Thus,

Ms. Zarate was not punished more severely for her conduct than other employees.

Fifth, Ms. Zarate claims evidence of pretext is found in the DCYF exaggerating

her workplace misconduct. She asserts the DCYF exaggerated the effect of the founded

finding and criminal charge by claiming the finding and charge completely disqualified

---

[1] Notably, Esmeralda Correa-Martinez for unauthorized access of confidential information unrelated to her duties and Maribel Rivera for unauthorized FamLink access and misuse of her state-issued phone.

her from her job. She contends this is untrue because the DCYF was able to put her on alternate assignment for almost a year. This was not, however, an exaggeration of the effect of the founded finding. According to DCYF policy, Ms. Zarate could not work as a Social Service Specialist 3 due to the founded finding because it prohibited her from having "unsupervised or direct client access, which is an essential part of her job." CP at 474-77.

Ms. Zarate further argues Ms. Perez's testimony that her inappropriate FamLink use was "shocking" and "egregious" was an exaggeration and that the DCYF mischaracterized her FamLink use as "ongoing." Br. of Appellant at 52. As Ms. Perez explained, however, Ms. Zarate's unauthorized access of FamLink was "egregious" because "it was such sensitive information, and it compromised the investigation of child safety, and it significantly compromised [the DCYF's] reputation and the public trust." CP at 519. Ms. Perez also testified, "The fact that it just had continued on for so long, it was just—it was rather shocking." CP at 519. Finally, characterizing Ms. Zarate's conduct as "ongoing" was an accurate description because Ms. Zarate accessed restricted files, including her own CPS file, almost 300 times over the course of more than two and one-half years. CP at 2039.

Lastly, Ms. Zarate argues the smiley face emoji Ms. Perez used in an e-mail thread containing her notice of discharge is evidence of union animus. Taken in context, the use of the emoji does not demonstrate pretext or union animus. As the DCYF points out, the

emoji was used at the end of an e-mail thread discussing the finalization and ultimate delivery of the notice of discharge to Ms. Zarate. The e-mail containing the emoji was sent in response to Ms. Perez's assistant stating she would "send out the email to Claudia." CP at 1623. Ms. Perez responded, "I already did 😊." CP at 1623. Ms. Perez also testified she sends smiley face emojis as a "part of polite communication." CP at 989. In context, the emoji was not used to express joy about Ms. Zarate's termination but was instead used to politely let Ms. Perez's assistant know she had already completed a task her assistant was offering to perform.

In sum, the PERC did not misapply or misinterpret the law. We will not reweigh the evidence and come to a different conclusion than the PERC. The PERC correctly concluded, based on the evidence, that Ms. Zarate did not meet her burden of showing her termination was pretextual.[2] The PERC's order and its findings and conclusions are supported by substantial evidence and it did not misinterpret or misapply the law.

WHETHER THE DCYF VIOLATED MS. ZARATE'S RIGHT TO DUE PROCESS

Ms. Zarate argues the DCYF violated her right to due process when it failed to follow its own procedures during its investigation and acted arbitrarily and capriciously

---

[2] Ms. Zarate also argues the superior court misapplied the legal standard but acknowledges that our review is de novo. Because we stand in the same position as the superior court and apply the APA standards of review directly to the agency record, what the superior court found and concluded is irrelevant to our review. *Postema*, 142 Wn.2d at 77.

24

in doing so. She alleges the PERC erroneously failed to address her due process issue. The DCYF and the PERC respond that Ms. Zarate's due process challenge was not properly before the PERC and the PERC did not err in declining to address it. We agree Ms. Zarate's due process argument was not properly before the PERC.

As the PERC and the DCYF point out, Ms. Zarate did not make a due process claim in her amended complaint. She first mentioned the issue of due process, in passing, in her notice of appeal to the PERC. Ms. Zarate substantively briefed her due process claim for the first time in her appeal brief to the PERC, arguing the DCYF "violated [her] right to due process" and that it was "an independent basis to reverse." CP at 165, 168 (some capitalization omitted).

The PERC "generally will not consider issues raised for the first time on appeal." *Int'l Fed. of Prof. and Tech. Engineers, Local 17 v. King County*, Decision 6994-B-PECB (2002).[3] The PERC's decision on appeal is limited to the record before it. *Kitsap County Juv. Det. Officers' Guild v. Kitsap County*, 1 Wn. App. 2d 143, 163, 404 P.3d 547 (2017) (citing WAC 391-45-390). Ms. Zarate did not raise a due process claim before the hearing examiner. Thus, the issue lacked the factual development necessary for review. We therefore decline review of Ms. Zarate's due process argument.

---

[3] https://decisions.perc.wa.gov/waperc/decisions/en/item/172737/index.do?q=6994-B

No. 40835-3-III
*Zarate v. Washington Public Employment Relations Commission*

ATTORNEY FEES

Ms. Zarate requests an award of attorney fees on appeal pursuant to RAP 18.1, RCW 49.48.030, and RCW 49.52.070. *See Int'l Ass'n of Fire Fighters, Local 46 v. City of Everett*, 146 Wn.2d 29, 51-52, 42 P.3d 1265 (2002). Because Ms. Zarate has not prevailed in this appeal, she is not entitled to attorney fees.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Cooney, A.C.J.

WE CONCUR:

_____
Lawrence-Berrey, J.

_____
Hill, J.